**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | **CASE NO: 8:18-CV-329** |
| Plaintiff, | |
| and | |
| ANDREW DEUSCHLE, | |
| Plaintiff-Intervenor, | |
| v. | |
| WERNER ENTERPRISES, INC., | |
| Defendant. | |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | **CASE NO: 8:18-CV-462** |
| Plaintiff, | |
| v. | |
| DRIVERS MANAGEMENT, LLC and WERNER ENTERPRISES, INC., | |
| Defendants. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## I.    Introduction

Andrew Deuschle and Victor Robinson wanted to be truck-drivers and were eminently qualified—they had graduated from approved truck-driving schools; had their Commercial Driver's Licenses, DOT Medical Cards, safe driving records; and had been approved by the federal government to drive commercial motor vehicles (CMVs). Yet Defendants Werner Enterprises, Inc. and Drivers Management, LLC (collectively "Werner") refused to hire them,

1

without any lawful excuse, because they are deaf. Werner is not entitled to summary judgment on any of the grounds it urges, and its motion should be denied in full.

Werner is flat wrong in arguing that the Supreme Court's decision in *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555 (1999), has any bearing here. That case dealt with a different statute, different regulatory language, and an experimental program drastically different from the federal safety program through which Mr. Deuschle and Mr. Robinson earned their Hearing Exemptions and concomitant right to drive interstate. Hearing Exemptions are lawful alternatives to traditional hearing tests, which Werner itself admits, and Werner does not contend that deaf drivers are less safe than hearing drivers. Moreover, its *Kirkingburg* argument is litigation-driven; it was not the actual reason for Werner's refusal to hire.

Deuschle and Robinson were fully able to perform the essential functions of the job. Werner has generated conflicting evidence about what those essential functions are. But even assuming that certain "real-time" communications during the observed, behind-the-wheel portion of the training was required and essential, the great weight of the evidence is that Deuschle and Robinson could perform it safely through a variety of reasonable accommodations, as shown by their own experiences, the expert testimony, and the testimony of other trucking companies.

Werner also seeks summary judgment on two affirmative defenses, for which it must prove every element as a matter of law. It cannot. There is no showing of direct threat because Werner conducted no individualized analysis and considered no reasonable accommodations, and because Werner's decision was based on gut reaction and a perfunctory inquiry, instead of the best available objective evidence that the defense requires. Likewise, Werner has not proved its business-necessity defense because it failed to consider reasonable accommodations, and because its decisions were not based on clear, consistent, across-the-board requirements.

Finally, there is sufficient evidence to show that Werner made unlawful inquiries which it is free to reinstate absent injunctive relief, and it also unlawfully classifies driver applicants with Hearing Exemptions in a way that disfavors their chances of hire.

## II.   Response to Werner's SOMF

1. Admitted

2. Admitted that the cited document states that company policy prohibits certain kinds of discrimination and provides reasonable accommodations in certain circumstances. Plaintiffs dispute that it is Werner's practice to follow this policy, as it failed to offer reasonable accommodation to Robinson or Deuschle. *See* responses to ¶¶ 42–44 and 57, below.

3. The cited record does not support Defendant's assertion. Plaintiffs therefore dispute.

4. Admitted

5. Disputed. Robinson and Deuschle met all applicable hiring criteria yet were not invited to attend new driver orientation. *Compare* Doc. 266-10[1] (Job Description) *with* Declaration of Victor Robinson (Ex.2), ¶¶ 2, 10–26, 27–34 *and* Declaration of Andrew Deuschle (Ex. 3), ¶¶ 3, 7, 14–34.

6. Admitted

7. Disputed. The cited record does not support Defendant's proposition that the application was "DOT-compliant."

8. Disputed. EEOC's Request for Information (RFI) dated February 12, 2016 (Ex. 4), p. 1 (requesting copy of Werner's employment application); Werner's response to February 12, 2016 RFI with attached employment application (Ex. 5); EEOC's RFI dated

---

[1] Unless otherwise noted, all docket documents refer to Case No. 8:18cv329.

September 26, 2016 (Ex. 6), pp. 3–4 (requesting all recruiting documents for "January 1, 2014 to the present"); Werner's response to September 26, 2016 RFI with attached employment application (Ex. 7).

9. Disputed. *Id*.

10. Disputed. *Id.*

11. Admitted

12. Objection. The paragraph is a statement of law, not fact, without record citation. But in response, <u>admitted</u> that Werner and its drivers are subject to various Federal Motor Carrier Safety Regulations (FMCSRs) promulgated by the Department of Transportation (DOT), some of which establish certain minimum driver qualifications and safety standards. Without further specificity from Defendant, <u>Plaintiffs dispute</u> that every part of 49 C.F.R. Parts 390, 391, 392, and 395 applies in this case.

13. Objection. The paragraph is a statement of law, not fact, without record citation. Also, disputed. The cited provision does not authorize anything; it simply does not prohibit more stringent health or safety requirements. But any such requirements must comport with the ADA.

14. Objection. The paragraph is a statement of law, not fact, without record citation. Also, disputed. The quoted language is in the cited regulation, but the quoted language does not reflect the only way to qualify, because it leaves out the Hearing Exemption alternative in 49 C.F.R. § 391.41(a)(3).

15. Objection. The paragraph is a statement of law, not fact, without record citation. Also, disputed. Werner is not required to ensure that all applicants for commercial driving meet the physical requirements set forth in 49 C.F.R. § 391.41(b)(11) (the Hearing Standard),

because federal law provides an alternative way to qualify via the Hearing Exemption. See 49 U.S.C. § 31136(a)(3) and (e); 49 U.S.C. § 31315; 49 C.F.R. § 390.5; 49 C.F.R. § 391.11; 49 C.F.R. § 391.41; 49 C.F.R. Part 381 Subpart C. This is further explained in Section V.A.1, below. Moreover, Werner itself recognizes this fact, and it hires Hearing Exemption holders. Doc. 264, Defendant's Statement of Material Facts (Def. SOMF), ¶ 74 (admitted below).

16. Objection. The paragraph is a statement of law, not fact, without record citation. Also, disputed. The FMCSRs do not dictate that all drivers operating CMVs in interstate commerce must meet the Hearing Standard (quoted in Def. SOMF ¶ 14), because the Federal Motor Carrier Safety Administration (FMCSA) created a process by which certain individuals may apply for the Hearing Exemption. Plaintiffs further dispute that individuals "may apply for a *waiver*. . . from the Hearing Standard." (emphasis added). The FMCSA's program is a not a "waiver" under 49 U.S.C. § 31315(a), nor is it a "pilot program" under § 31315(c). Instead, it is an exemption program under § 31315(b) that the Agency has found "would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." 49 U.S.C. § 31315(b)(1).

17. Objection. The paragraph is a statement of law, not fact, without record citation.

18. Objection. The paragraph is a statement of law, not fact, without record citation. Also, disputed. 49 U.S.C. § 31315(b)(1) states: "Upon receipt of a request pursuant to this subsection, the Secretary of Transportation may grant to a person *or class of persons* an exemption from a regulation. . . if the Secretary finds such exemption would likely achieve a level of safety that is equivalent to, or greater than, the level that would be

achieved absent such exemption." (emphasis added). Individual driver-applicants did not separately provide the "analysis of safety impact" and "specific countermeasures." Instead, the Secretary received that information as part of the National Association of the Deaf's initial application and its own investigation. 78 FR 7479-01 ("In support of its application for exemption, the National Association of the Deaf (NAD), cited and relied on a study requested by the Agency's Medical Review Board."); Doc 266-12, Evidence Report Presented to FMCSA August 26, 2008; *see also* 80 FR 18924-01; 82 FR 15552-01; 84 FR 26717-02 (granting and renewing Robinson's and others' Hearing Exemption and considering evidence submitted by NAD); 80 FR 22768-01; 81 FR 50593-01 (same regarding Deuschle).

19. Objection. The paragraph is a statement of law, not fact, without record citation.

20. <u>Admitted</u> as to "In February 2013, the FMCSA began issuing exemptions from the Hearing Standard ("FMCSA Hearing Exemption") to certain deaf or hard-of-hearing individuals, allowing them to obtain a Commercial Driver's License (CDL), despite their inability to meet the Hearing Standard. 78 FR 7479." <u>Disputed</u> that "the FMCSA conceded that it had not identified any studies addressing the relationship between hearing loss and crash risk among CMV drivers." Instead, the FMCSA reviewed: over 100 hours of interviews with deaf drivers; the FMCSA's 2008 Evidence Report; experience in States allowing deaf CMV drivers; and a thorough evaluation of each driver's qualifications, safety experience, and medical condition. 78 FR 7479-01.

21. <u>Admitted</u> that the FMCSA acknowledged "there could be potential consequences of a driver being hearing impaired and/or deaf while operating a CMV under some scenarios." <u>Disputed</u> that the Agency "nonetheless began issuing Hearing Exemptions." Rather, the

Agency determined "the drivers covered by the exemptions *do not* pose a risk to public safety." 78 FR 7479-01 (emphasis added).

22. Admitted

23. Disputed. Werner claims such drivers were required to complete either the placement driver program, or the advanced placement (aka co-driver) program. Ben Pile Deposition (Ex. 8), at 183:22–184:16.

24. Admitted that this is what the cited document states.

25. Disputed. There is no exact number of hours for the training; it depends on performance in orientation. 30(b)(6) Deposition of Werner (Jamie Maus testifying) (Ex. 9), at 171:14–21.

26. Admitted, but Plaintiffs clarify that the "observed" portion of over-the-road training for placement (aka student) drivers can be as little as 30 hours, and there is no specific requirement for "observed" driving for the advanced placement program. Doc. 266-2 (Handbook), at 20–22.

27. Disputed that all such communications must be in real time. Expert Don Olds's Rebuttal Report (Ex. 10), at 3–5.

28. Admitted that "they gradually progress to more complex driving tasks. . . finally driving 'in all environments, all times of the day and night.'" Disputed that "Because many placement drivers have little or no prior experience driving a loaded CMV on public roadways" as unsupported by the cited portion of the record.

29. Disputed. Werner's citations do not support the contention that Robinson's and Deuschle's driving in their Werner-approved CDL schools didn't occur in cities or during inclement weather. Further, their CDL schools also required "real-time instruction." *See*

Victor Robinson Deposition (Ex. 11), at 39:3–15; 64:5–11. Further disputed that all such communications must be in real time. Ex. 10 at 3–5.

30. Admitted

31. <u>Admitted</u> that Werner's placement driver program is different from CDL training.

    <u>Disputed</u>: (1) Werner's characterization of that difference as unsupported by the record and improperly seeking an inference in movant's favor on summary judgment; and (2) "In CDL school, a trainee and a trainer are generally operating the CMV in a more controlled environment, covering routes that are pre-assigned by the school or known and chosen by the driver." Robinson's trainer did not provide him with the routes in advance, and there is no evidence of what his trainer knew. Ex. 11 at 42:5–13; Expert Report of Don Olds (Ex. 12) at 8 ("Training includes: city and highway driving, dealing with traffic and road construction …").

32. Disputed. The cited record does not support Werner's proposition. Adams, as a retained expert, is not qualified to testify to what "Werner believes." Further, the cited portion of Maus's testimony lists only the situations where Werner believes communication is necessary, not the reasons. The citation only discusses the trainer communicating to the deaf driver, not two-way communication. Plaintiffs also dispute that communications always are, or need to be, "constant," as only a portion of the behind-the-wheel training is required to be observed. Doc. 266-2 (Handbook), at 20.

33. Admitted

34. Admitted

35. Admitted

36. <u>Admitted</u> that Robinson was not asked individually about this, e.g., safety impacts or comparisons with hearing drivers. <u>Disputed</u> that *nobody* provided such material in support of the application. See the response to Def. SOMF ¶¶ 18 and 20 above. *See also* 80 FR 18924-01; 82 FR 15552-01; 84 FR 26717-02 (granting and renewing Robinson's and others' Hearing Exemption and considering evidence submitted by NAD); 80 FR 22768-01; 81 FR 50593-01; 83 FR 34648 (same regarding Deuschle).

37. Admitted

38. Admitted

39. Admitted

40. Disputed. Robinson drove over the road in CDL training for more than one day. Ex. 11 at 41:15–42:17; 36:6–15 (between 140 to 160 hours).

41. Admitted

42. Admitted, though Defendant's list of non-verbal communications is incomplete.[2] Available non-verbal means of communication include the accommodations referenced in Dr. Steven Arndt's Expert Report (Ex. 13), including at 53, 55–67; Don Olds's Expert Report (Ex. 12), including at 10–11; Deposition of C.R. England (Ex. 14), at 23:–24:1; Deposition of Western Express (Ex. 15), at 16:19–17:21, 21:24–22:6; Deposition of Crete Carrier Corp. (Ex. 16), at 27:15-28:16; Deposition of Swift Transportation (Ex. 17) at 13:21–14:19, as more fully explained in Section V.A.2.a below.

---

[2] Defendant's citation appears inaccurate; filing 246-10 does not include this Interrogatory answer.

43. Disputed. Werner's concerns were not "legitimate." There are various ways to communicate safely, as shown in response to ¶ 42 above. In addition, there is evidence of anti-deaf animus at Werner. See response to ¶ 68 below.

44. Disputed. Werner's concerns were not "legitimate." In addition, there are various ways to communicate safely, cited in response to ¶ 42 above.

45. Disputed. The cited portion of the record does not support the contention. Further, the only evidence Werner points to for its "research" into possible accommodations for deaf drivers is Maus's testimony, which shows how inadequate and incomplete her inquiry was. Ex. 9 at 18:3–14. She failed to talk to Roadmaster at the time, which Werner owned, and which trains deaf drivers. *Id.* at 61:18–20; 65:19–67:10. She did not speak to C.R. England, which was part of her safety group and which had already trained Deuschle, Ex. 9 at 22:24–23:4; 23:12–15, Andrew Deuschle Deposition (Ex. 18) at 54:9–12; 55:3–5; 56:2–5; 58:8–11; 59:6–9; Deuschle DOT Documents (Ex. 28), at p. 3, or Crete, which Werner recognizes as a very reputable company as far as its training, Scott Hollenbeck Deposition (Ex. 19), at 315:6–10, and which had likewise trained Deuschle at this point. Ex. 18 at 80:14–17; 82:15–24; 83:9–17; 84:7–12.

46. Disputed. The cited portion of the record does not support the contention that Maus was looking for guidance. She testified she was looking for research studies. Further, see response to ¶ 45 above.

47. Admitted that this is what Maus testified to. Disputed as hearsay that cannot be made admissible at trial.

48. Admitted that according to Maus, the unidentified "NDOT representative was unable to suggest any other means by which a trainer could communicate with a totally deaf

student driver, while on the road, other than pulling over to the side of the road."

<u>Disputed</u> that there are no other means (see response to ¶ 42 above) and note that the individual she claimed to speak with was not a trainer.

49. <u>Admitted</u> that Maus testified that she called an individual with the ATA whose name she does not recall, and which she did not document. Ex. 9 at 20:17–20; 18:8–11. Maus also admits that she did not ask this person how to accommodate deaf drivers. Ex. 9 at 22:11–15. <u>Disputed</u> as hearsay that cannot be made admissible at trial.

50. <u>Admitted</u> that Maus testified she spoke with an unidentified FMCSA representative. <u>Disputed</u> that there was no means by which to communicate with a completely deaf individual during observed over-the-road training. See response to ¶ 42 above.

51. Disputed. At least one member of the benchmarking group, C.R. England, had already hired and trained a deaf driver, Andrew Deuschle. Ex. 18 at 54:9–12; 55:3–5; 56:2–5; 58:8–11; 59:6–9; Ex 28 at p. 3.

52. <u>Admitted</u> that Maus testified that she "learned of a study conducted in or around 2005…" <u>Plaintiffs dispute</u> that Maus conducted "research." The only evidence Werner points to for its "research" into possible accommodations for deaf drivers is Maus's testimony. Maus did not contact anyone in writing and made no notes of any inquiries. Ex. 9 at 18:3–14. See response to ¶ 45 above.  <u>Plaintiffs further dispute</u> there was no means by which to safely train deaf individuals during observed over-the-road training. See response to ¶ 42 above.

53. <u>Admitted</u> beginning at "Maus participated in a 30-minute phone call with Robinson" through the remainder of the paragraph. <u>Disputed</u> that Maus conducted "research." She

did not contact anyone in writing and made no notes of any inquiries. Ex. 9 at 18:3–14.
See response to ¶ 45 above.

54. Admitted

55. Admitted

56. <u>Disputed</u> that the view attributed to Ms. Maus was correct; the evidence supports
numerous ways to accommodate deaf drivers safely. See response to ¶ 42 above.

57. <u>Disputed</u>. It is not true that Maus was unable to identify viable means to safely
accommodate. See response to ¶ 42 above. Disputed: the correctness of Maus's described
conclusion.

58. <u>Admitted</u> that the only reason Werner gave for its "decision not to hire Robinson 'boiled
down to the over-the-road instruction in the cab when he was driving.'" <u>Disputed</u> that
there is no way to safely train exemption holders. See response to ¶ 42 above.

59. <u>Admitted</u> that Maus testified as described. <u>Disputed</u> that there is no way to safely train
exemption holders. See response to ¶ 42 above.

60. Admitted

61. Admitted

62. <u>Admitted</u> that Deuschle correctly filled out the FMCSA waiver form according to the
requirements of the exemption. <u>Disputed</u> that nobody provided such material in support
of the application. See response to ¶ 18 above; Doc. 266-12 (Evidence Report). <u>Disputed</u>
that this is "curious," given the explanation in the Federal Register. See responses to ¶¶
18 and 36.

63. Admitted

64. Admitted

65. <u>Admitted</u> that Deuschle did not list professional driving experience on his resume or applications provided by Werner but <u>disputed</u> to the extent Werner implies it did not know of his professional driving experience. See response to ¶ 68 below. Werner confirmed it knew Deuschle had five months of experience. Emails between Deuschle and Werner (Ex. 20), at 1. Moreover, Werner never asks for and does not require a resume from its applicants. Ex. 8 at 62:21-23; 63:6-9.

66. Admitted.

67. Disputed. At the time and with his experience, Deuschle was eligible for the experienced or the advanced-placement program. Ex. 8 at 76:10–77:6; 25:2–7; Ex. 19 at 66:4–67:4.

68. Disputed. Plaintiffs also object that this is not a material fact relevant to Werner's arguments in its Motion for Summary Judgment, which do not address any failure to provide information to Werner. Nevertheless, Plaintiffs' contest Werner's contentions in this paragraph. Deuschle reported his past truck-driving experience to his recruiter, Emails between Deuschle and Werner recruiter (Ex. 21) at 2, who was tasked with filling in missing information, Chad Rivedal Deposition (Ex. 22), at 31:10–17; Ex. 8 at 16:8–18; Ex. 19, at 254:4–17, as were supervisors. Ex 19 at 169:7–170:16. His recruiter did not seek any additional information, Ex. 19 at 242:21–244:7, nor did the supervisors, Ex. 8 at 123:8–16, and Werner itself categorized Deuschle as being an experienced driver. Ex. 8 at 76:10–77:6. Others knew about his experience, Ex. 22 at 40:5–41:1; Ex. 19 at 266:1–267:7; Deuschle's Second Declaration (Ex. 23) ¶ 3. Werner also pre-approved Deuschle, Ex. 19 at 213:24–214:7; Ex. 22 at 39:11–21; Ex. 8 at 76:2–8; Deuschle Application Pre-approval (Ex. 24); Audit Trail Data (Ex. 25), meaning that his application appeared to meet Werner's minimum hiring guidelines. Ex. 19 at 118:8–119:1; 120:25–121:8. *See*

*also* Morgan Baker-Maloy Deposition (Ex. 26) at 42:25–43:6; Dale Hunt Deposition (Ex.

27), at 92:5–13. Werner also contracted with others to confirm employment history. Ex.

19 at 144:24–145:5; 159:20–161:16; 166:21–167:12. It is also untrue that Werner refused

to hire Deuschle because he did not give them his Hearing Exemption. This is a

"shifting" explanation that Werner initially did not provide. Ex. 19 at 279:24–281:14. It

was not requested when Deuschle disclosed his deafness. Ex. 19 at 235:18–238:9. In fact,

Werner knew Deuschle had a Hearing Exemption, Ex. 28 at 3–4; Ex. 19 at 273:20–275:4;

Email with Exemption letter (Ex. 29); Ex. 19 at 195:14–22, Werner could easily check

for an applicant's CDL, Ex. 19 at 279:3–5, and could easily confirm the Exemption. Ex. 9

at 38:19–39:7; Ex 19 at 278:23–279:2. And Deuschle's documentation was sufficient for

the other trucking companies he worked for. Ex. 23 at ¶7. Werner never told Deuschle

that the Exemption document he submitted was insufficient. Ex. 23 at ¶6. Werner cannot

say with any clarity who made the ultimate decision to reject Deuschle. Ex. 19 at 18:13–

25; 293:9–25; 229:11–13; 246:17–19; 247:1–3; Ex. 22 at 42:6–46:11; Deposition of Erin

Marsh (Ex. 30) at 188:21–189:10; Deposition of Donny Gibbs (Ex. 31). at 49:1–50:7; Ex.

8 at 94:7–15; 96:2–4. The real reason why Mr. Deuschle was rejected was because he

was deaf, and Werner's bias against him due to being deaf. Ex. 21 at 1; Ex. 31 at 49:1–

50:7; Ex. 18 at 39:17–41:2; Ex. 27 at 68:20–69:3; Ex. 19 at 244:13–245:12; Ex. 30 at

190:19–192:9; Ex. 8 at 77:17–78:2; 149:19–150:6; 158–173; Ex. 22 at 46:17–22; Ex. 30

at 115–139. There is other evidence of pretext, including Werner claiming to the EEOC

that it rejected Deuschle because he did not go to an approved school, which it later

admitted was untrue. Ex. 19 at 57:18–23; Ex. 27 at 28:10–19; Ex. 18 at 19:2–9; Ex. 21 at

2, and its failure to follow its own process in considering his application. Ex. 8, 131:21–132:19

69. Admitted that this is Werner's testimony. But at the time and with his experience, Deuschle was eligible for the experienced or advanced-placement program, not the placement driver program. There is also evidence of Werner's anti-deaf animus. *See* ¶ 68 above.

70. Admitted

71. Admitted

72. Admitted

73. Admitted

74. <u>Admitted</u> that Werner hires Hearing Exemption Holders. <u>Disputed</u>: the remainder of the fact. The citations do not support all of these statements, and some of the page cites do not exist. Plaintiffs agree that Marsh first testified that she knew of one Hearing Exemption holder with sufficient experience who Werner hired. Ex. 30. 26:11–16, 28:11–12. Later, she stated that Werner had invited a second such driver to orientation. Ex. 30 at 64:13–65:9. None of the cited provisions describe any individualized assessment.

**III.    Plaintiffs' Statement of Material Facts**

1. Deaf drivers can be trained safely and effectively in over-the-road training using: short-duration, one-handed signals; small red, yellow, and green flags with simple instructions like "go," "stop," and "caution" on them; and spiral bound flashcards, tabbed and easy to access. Ex. 12 at 10–11; Ex. 13 at 53.

2. These methods of training do not require a driver to take their eyes off the road for any longer than it takes to check a mirror, read a road sign, check the radio, check the time, or glance at a GPS or map. Ex. 12 at 10.

3. These methods are clearer and simpler than spoken commands. Ex. 12 at 24.

4. Electronic displays such as an iPad mounted on the dash in front of the driver allow for instantaneous communication with a deaf driver. Ex. 13 at 55–65.

5. Heads-up displays are available that project images onto the windshield in a manner that does not obstruct the view, allowing a deaf driver to never have to take his eyes off the road even for the briefest of moments. Ex. 13 at 66–67.

6. Covenant Transport, Western Express, Swift Transportation, Crete Carriers and CR England have successfully trained deaf Hearing Exemption holders in their new-driver programs. Deposition of Covenant (Ex. 32) 13:4–8, 15:5–8; Ex. 11 at 67:17–68:12; Ex. 15 at 5:23–16:6; Ex. 17 at 9:17–22; Exhibit 16 at 18:24–23:17; Ex. 14 at 16:9–18:12.

7. During over-the-road training, these companies utilize simple gestures, hand signals, short written signs, color-coded cards and flash cards. Ex. 18 at 83:9–17; 84:7–12; Ex. 33 at 19:13–20:5; Ex. 15 at 16:14–17:14; 21:12–22:6; Ex. 17 at 13:21–14:19; Ex. 14 at 23:2–24:1.

8. Werner owns Roadmaster driving school and can require changes to its training. Ex. 9 at 46:22–25; 61:18–62:15

9. Roadmaster trainers utilize ASL interpreters and hand gestures to communicate with deaf drivers during over-the-road training. Robinson Depo. (Ex. 11) at 39:3–15, 64:5–11.

10. When Robinson started with Covenant, he completed an orientation and test. He then had to drive with a mentor for 240 or 260 hours before driving on his own or in a team, Ex. 11 at 67:17–68:12, which he successfully completed. Ex. 11 at 68:9–12.

11. Robinson drove over-the-road with his mentor at Covenant. Ex. 11 at 68:21–69:6.

12. While driving with his Covenant mentor, Robinson would receive communication using gestures or on a white board. His mentor did not know ASL. Ex. 11 at 69:10–20; 70:4–20.

13. Andrew Deuschle successfully completed C.R. England's driver-training program. Deuschle Depo. (Ex. 18) at 55:3–5; 59:6–9.

14. As part of the C.R. England training program, Deuschle had to drive with a trainer for several weeks before driving on his own or in a team. Ex. 18 at 56:2–5.

15. During training and while Deuschle was driving, the C.R. England trainer would communicate using simple gestures or hand signs. Ex. 18 at 58:8–11.

16. Maus never documented her calls to the ATA, NDOT, and FMCSA. Ex. 9 at 17:23–18:11.

17. Maus could not identify who she spoke with at the ATA, NDOT, and FMCSA. Ex. 9 at 18:15–19:5, 20:13–22:10, 32:20–33:16, and she failed to get input at the time from Werner's own training school Roadmaster, from a member of her safety benchmarking group CR England, or from Crete, a company Werner recognizes as having a reputable training program, Ex. 9 at 61:18–20; 65:19–67:10; 22:24–23:4; 23:12–15; Ex. 19 at 315:6–10, all of which had experience training new drivers or employees with Hearing Exemptions. Ex. 9 at 65:19–66:7; Ex. 18 at 54:9–12; 55:3–5; 56:2–5; 58:8–11; 59:6–9; 80:14–17; 82:15–24; 83:9–17; 84:7–12; Ex. 28 at 3.

17

18. In order to earn their CDLs, deaf drivers must pass the tests and meet the same criteria as hearing drivers. Ex. 12 at 4–5.

19. The only difference is that those with a Hearing Exemption are not required to pass the DOT's hearing requirement. *Id*.

20. Werner's training program does not appear in the driver job description. Doc. 266-10 (Job description).

21. Observed over-the-road training can be as little as 30 hours of the 246 or more driving hours required by Werner's student driver program, and there is no specific requirement for "observed" driving for the advanced-placement program. Doc. 266-2 (Handbook) at 20–22.

22. When Deuschle applied to Werner in March 2015, he had almost 5 months of over-the-road driving experience with C.R. England, from November 2014 to February 2015. Deuschle Declaration at ¶ 8.

23. Today, only those with less than 90 days of driving experience have mandatory new-driver training. Ex. 8 at 48:6–22.

24. In response to a February 12, 2016, Request for Information (RFI) from the EEOC seeking "a blank copy of your employment application," Werner provided a copy of the application that asks, "Is there any reason you might be unable to perform the functions of the job for which you have applied as described in the attached job description?" Ex. 4 at 1 (requesting copy of Werner's employment application); Ex. 5 (Werner's response with attached application); Ex. 19 at 298:2–300:19 (Hollenbeck provided the application in response to EEOC request).

25. In response to a September 29, 2016, RFI from the EEOC seeking "a copy of the Recruiter's training manual or all documents related to the recruiting process for the relevant time period," Werner provided a copy of the application that asks, "Is there any reason you might be unable to perform the functions of the job for which you have applied as described in the attached job description?" Ex. 6 at 4 (requesting all recruiting documents for the "relevant time period"); Werner's response to September 26, 2016 RFI with attached employment application (Ex. 7).

26. The "relevant time period" for the September 29, 2016, RFI was defined as January 1, 2014 to present. Ex. 5 at 3.

27. Werner pre-approves a driver's application when it appears to meet Werner's minimum hiring guidelines. Ex. 19 at 118:8–119:1; 120:25–121:8; Ex. 8 at 64:25–65:4.

28. When the application is pre-approved, Werner extends a conditional offer of employment. Ex. 8 at 64:25–65:4; Ex. 19 at 147:2–17.

## IV. Legal standard

On motions for summary judgment, the Court must view the record in the light most favorable to the non-moving party and must give the non-moving party "the benefit of all reasonable inferences that may be drawn from the evidence." *Maitland v. University of Minn.*, 155 F. 3d 1013, 1015 (8th Cir. 1998). A motion for summary judgment should be denied unless "a reasonable jury would not have a legally sufficient evidentiary basis" to support the verdict. *Masters v. City of Indep., Missouri*, 998 F.3d 827, 835 (8th Cir. 2021) (quoting *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012)).

When a defendant moves for summary judgment but bears a burden at trial—as on its affirmative defense—that burden at summary judgment is higher. *See International Shortstop,*

*Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991.) Werner must prove every element

of its direct threat and business necessity affirmative defenses.

V.      **Argument**

    A.   **Plaintiffs, not Werner, are entitled to summary judgment on their
        discrimination claims.**

"To establish a prima facie case of disability discrimination under the ADA, [plaintiff]

must show that (1) [he] is disabled as defined in 42 U.S.C. § 12102(2); (2) [he] is qualified to

perform the essential functions of the job, with or without reasonable accommodation; and (3)

[he] has suffered an adverse employment action because of [his] disability." *Alexander v.

Northland Inn*, 321 F.3d 723, 726 (8th Cir. 2003) (citing *Benson v. Northwest Airlines, Inc.*, 62

F.3d 1108, 1112 (8th Cir. 1995)). Werner disputes only the second part, claiming Robinson and

Deuschle are, as a matter of law, not qualified for the driver position.

Under the ADA, a person is "qualified" if they (1) satisfy the requisite skill, experience,

education and other job-related requirements of the employment position such individual holds

or desires, and (2) can perform the essential functions of such position, with or without

reasonable accommodation. 29 C.F.R. § 1630.2(m). Werner argues that Deuschle and Robinson,

who are deaf, were unable to meet the first prong because they qualified for their CDLs based on

an FMCSA Hearing Exemption instead of the standard hearing exam. Werner also argues that

Deuschle and Robinson were unable to meet the second prong because they could not be safely

trained. Werner is wrong on both counts.

As to the first prong—and contrary to Werner's misleading arguments—the Hearing

Exemption program is a lawful alternative to the standard hearing test, and of equal validity in

establishing that they are qualified to drive a CMV. Werner itself recognizes that fact, as it

accepts drivers with the Hearing Exemption. Def. SOMF ¶ 74. As to the second prong, this is the

true focus of this case—whether reasonable accommodations would have enabled Deuschle and Robinson to satisfactorily complete Werner's applicable training programs. As shown below and in Plaintiffs' Motions for Summary Judgment, the evidence shows such accommodations were available.

1.  The Hearing Exemption program is a lawful alternative qualification to the standard hearing test.

    a.  Werner's reliance on *Albertson's, Inc. v. Kirkingburg* to show deaf drivers are unqualified as a matter of law is misplaced.

Werner refused to hire Deuschle and Robinson because they were granted a Hearing Exemption by the FMCSA in order to receive their DOT medical cards.[3] Werner argues that the instant cases are controlled by *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999). *Kirkingburg* held that the employer was not required to accept a truck-driver who could not meet the federal vision standards, even though he hoped to enroll in an experimental vision waiver program in the future. *Kirkingburg* is inapplicable here, as it dealt with a different statute, did not address the relevant regulations and the program at issue, unlike Hearing Exemption program, was not a research-based exemption program at all.

But there is another, more fundamental problem with Werner's argument—the company itself *does not claim* that it has of policy of refusing to employ deaf drivers with Hearing Exemptions. Werner's Statement of Material Facts (Def. SOMF) ¶¶ 58–59; 68–69. In fact, Werner contends that it *does* hire such drivers with the Hearing Exemption, at least once they have experience.[4] *Id*. at ¶ 74. Thus, Werner itself fully recognizes the Hearing Exemption

---

[3] The DOT medical card permits CDL holders to driver interstate. *See* https://www.fmcsa.dot.gov/registration/commercial-drivers-license/medical.

[4] The amount of experience Werner requires has changed over time and is now 90 days. See Plaintiffs' Statement of Material Fact (PSOMF) at ¶23.

program as a lawful, and equally valid, way to qualify as a CMV driver. In *Kirkingburg*, the employer was clear that the reason for its failure to hire was its refusal to participate in the very different, and scientifically unsupported, experimental vision-waiver program. Here, even if *Kirkingburg* applied (which is doesn't), and thus even if Werner could not be forced to recognize Hearing Exemption holders, it has already *chosen to do so*.

Moreover, the employee in *Kirkingburg* had not even received the waiver at issue in that case. 527 U.S. at 559–60. The plaintiff was asking for the employer to overlook his non-conformity with vision safety standards in hopes that he would eventually obtain the waiver. *Id.* In this case, though, Deuschle and Robinson had already earned the Hearing Exemption through notice-and-comment rulemaking. 49 U.S.C. § 31315(b)(6) (each Exemption request is subject to notice and comment). Hiring them would not have required Werner to overlook any laws; all it would need to do is honor their DOT cards.

> b.  The Hearing Exemption is an alternative means to satisfy the DOT's hearing standard and is not an experimental waiver like in *Kirkingburg.*

Even if Werner *had* contended that it refused to hire the truck-drivers in this case simply because they held Hearing Exemptions, which it didn't, *Kirkingburg* would still be inapplicable on its face. *Kirkingburg* dealt with different statutory and regulatory language. Under current statutes, the Secretary of Transportation is empowered to create three different kinds of programs related to safety standards—waivers, pilot programs, and formal exemptions. 49 U.S.C. § 31136(e). Those programs may relate to any regulations in that section, 49 U.S.C. § 31136(e), which include regulations addressing the physical requirements for truck-drivers. 49 U.S.C. § 31136(a)(3). Those three programs are further described in 49 U.S.C. § 31315. A "waiver" lasts three months or less and is for unique events. 49 U.S.C. § 31315(a). A "pilot program" is designed to evaluate new safety alternatives. 49 U.S.C. § 31315(c). In contrast to both of those,

and relevant here, an "exemption" program approves multi-year commercial driving for a class of individuals that the DOT has already found "would likely achieve a level of safety that is equivalent to, or greater than, the level that would be achieved absent such exemption." 49 U.S.C. § 31315(b).[5]

Hearing exemptions are granted for up to five years and are renewable, and all exemption requests are published in the Federal Register, giving the public an opportunity to comment and inspect the relevant safety analysis. 49 U.S.C. § 31315(b)(2), (6). In addition, the FMCSA is required to revoke an exemption immediately if a person fails to comply with the terms and conditions of the exemption, if the exemption has resulted in a lower level of safety than was maintained before the exemption was granted, or if continuation of the exemption would not be consistent with the goals and objectives of the enabling statutes. 49 U.S.C. § 31315(b)(4). By contrast, the program in *Kirkingburg* was a "waiver" program. *See e.g.*, 527 S. Ct. at 571–72. The creation of "exemption" programs actually post-dates the facts in *Kirkingburg* and was never even considered by the Court. 527 U.S. at 576 n.21. The Hearing Exemption program is very different from the 1992 experimental vison program at issue in *Kirkingburg*, which expired in 1996. *Id.*

Werner contends that it is bound by 49 C.F.R. § 391.41 and the physical standards referenced there. But that regulation expressly states that a person is qualified to be a CMV driver *in either of two ways*—by meeting the standard physical requirements, *or* by having a "medical variance." 49 C.F.R. § 391.41(a)(3). And a "medical variance" is explicitly defined to

---

[5] *Kirkingburg* itself recognized that after the facts at issue in that case, Congress amended the relevant statute permitting the Secretary of Transportation to issue a two-year renewable "exemption." 527 U.S. at 572 n.18, *citing* 49 U.S.C. § 31315(b). But as neither that statute nor that exemption program was at issue in *Kirkingburg*, the Court expressly stated that it was not considering it. 527 U.S. at 576 n.21.

include an "exemption letter," including for the hearing standard. 49 C.F.R. § 390.5. *See also* 49 C.F.R. Part 381 Subpart C (describing exemption programs and to which FMCSRs they apply). Similarly, Werner argues that 49 C.F.R. § 391.11 requires that it ensure the physical abilities of its drivers. 49 C.F.R. § 391.11(b)(4). True, but that regulation also clarifies that a driver is physically qualified in either of two ways—hearing test or exemption—by cross-referencing Subpart E, which contains 49 C.F.R. § 391.41(a)(3) described above. Werner even acknowledges this, stating that it "*must* confirm that every applicant meets those standards *or has a valid exemption*." Werner's Brief in Support of Motion for Summary Judgment (Def. BIS) at 33–34 (second emphasis added).

Werner wrongly suggests *Kirkingburg* interpreted these same regulations. But the regulations considered in *Kirkingburg* did not provide for "medical variances" and "exemptions." These qualification methods did not exist at the time of *Kirkinburg*, but they exist when Deuschle and Robinson applied to work for Werner.

The DOT adopted the Hearing Exemption based on a scientific review of the safety literature involving deaf drivers, over 100 hours of interviews with individuals who are deaf and hard of hearing, and an individualized review of each applicant, including their medical status and their driving records (many of whom had experience driving commercial trucks intrastate). *Qualification of Drivers; Application for Exemptions; National Association of the Deaf*, 78 FR 7479-01 (FMCSA Feb. 1, 2013) The Agency also sought and received hundreds of public comments on the individual exemption applicants. 78 FR at 7480. As a result, exemption holders receive a more rigorous safety screening than do other commercial truck-drivers, and DOT gives equal weight to the Hearing Exemption as a means of qualifying to be a CMV driver. None of this was present for the vision-waiver program in *Kirkingburg*, which the Court repeatedly cited

as short-term and "experimental" in a genuine sense. *See, e.g.,* 527 U.S. at 576 ("[t]he waiver

program was simply an experiment with safety"); 577–78 ("experimental waiver"). The Court's

narrow holding was that under *those* circumstances, employers were not obliged to participate in

the FHWA[6] "experiment." *Id*. at 577.

In direct contrast, the Hearing Exemption program is not an experimental waiver. In fact,

the FMCSA explicitly rejected that proposal, finding that the data already reflected no difference

in safety, and that no further studies needed to be completed. 78 FR 7479-01. The FMCSA also

rejected personal opinions regarding safety concerns, finding them unsupported by the science.

*Id*. It also noted the U.S. Equal Employment Opportunity Commission's commentary that the

exemption program "would be consistent with the Americans with Disabilities Act … as it

represents current and objective evidence." *Id*. Subsequent notice and comment, and subsequent

reviews of additional scientific and crash-data literature, reinforced the program confirming that

exemption holders "do not pose a risk to public safety" and they "achieve[] a level of safety that

is equivalent to or greater than the level that would be achieved absent such exemption." E.g., 82

FR 61809-01 (FMCSA Dec. 29, 2017). The program has been firmly established for almost ten

years, continuing through three presidential administrations, is reported on annually to Congress,

49 U.S.C. § 31315(e), it was reaffirmed in 2017, 82 Fed. Reg. 61809 (FMCSA Dec. 29, 2017),

and it has no sunset date. It is not an experiment, nor a pilot program under 49 U.S.C. §

31315(c). Instead, it revises the law and gives deaf and hard of hearing drivers an alternative

means to satisfy the safety standards, as set forth in 49 C.F.R. § 391.41. *See Encino Motorcars,*

*LLC v. Navarro*, 579 U.S. 211, (2016) ("When Congress authorizes an agency to proceed

through notice-and-comment rulemaking, that relatively formal administrative procedure is a

---

[6] The FHWA is the precursor to the FMCSA.

very good indicator that Congress intended the regulation to carry the force of law …") (internal quotes omitted). Nothing in the regulations authorizes a carrier to disregard a Hearing Exemption.

Werner's arguments attacking the FMCSA and its regulatory actions are misplaced. Werner had ample opportunity to challenge the FMCSA's program through appropriate means, i.e., under the Administrative Procedure Act within applicable time limits. *See, e.g., Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 758–59 (8th Cir. 2009). Moreover, Werner did not reject Deuschle and Robinson because they lacked DOT cards (a qualification they both possess) and it did not disregard their Hearing Exemptions because of any safety risk (which DOT/FMCSA studied and found did not exist). Unlawful disability discrimination motivated Werner's actions.

      c.   Other cases relied upon by Werner are distinguishable and inapplicable to this case.

The other cases Werner cites, *Witchet v. Union Pac. R.R. Co.*, No. 8:18CV187, 2020 U.S. Dist. LEXIS 260843 * (D. Neb. Feb. 21, 2020) and *Wyatt v. J.B. Hunt Transp., Inc*., No. 4:08CV01501JMM, 2009 U.S. Dist. LEXIS 19944 * (E.D. Ark. Mar. 12, 2009), are likewise inapplicable. In both of those cases the plaintiffs—Witchet at risk of seizures after a stroke, and Wyatt with a substance abuse relapse—could not meet the DOT standards. In this case, however, Deuschle and Robinson *did* meet DOT standards and were qualified to drive.

Werner further argues that it is entitled to make its own judgment about necessary job qualifications under the ADA, citing *Quick v. City of Fort Wayne*, No. 1:15-CV-056 JD, 2016 U.S. Dist. LEXIS 131868 (N.D. Ind. Sep. 27, 2016) and *Tate v. Farmland Indus., Inc*., 268 F.3d 989 (10th Cir. 2001). But *Quick* addresses the second prong of the definition of "qualified," and the plaintiff admitted that he could not perform an essential function of the position. *Quick*, 2016

WL 5394457, at *4. That is not the situation here. *Tate*, dealt with the first prong of the definition of "qualified," but the record in that case reflected that the driver with epilepsy could not meet the DOT's own interpretation of its medical standards. *Tate*, 268 F.3d at 994–95 (10th Cir. 2001).[7] Again, that is the opposite of the situation here.

> 2.  Reasonable accommodations would have enabled Deuschle and Robinson to successfully complete Werner's driver training programs.

Under the second part of the "qualified" definition, the plaintiff must "be able to perform the essential job functions, with or without accommodation." *Fenney v. Dakota, Minn. & Eastern R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). If the employer disputes that someone can perform the essential functions, it has the burden to provide evidence of those essential functions. *Id.* If the employee cannot perform the essential functions of the job without accommodation, the employee must make a facial showing that an accommodation is possible. *Id.* The burden of production then shifts to the employer to show it is unable to accommodate the employee. *Id.*

The only essential function Werner maintains Deuschle and Robinson could not perform is its initial training program, and the only part of that program they address is the over-the-road training.[8] According to Werner, it believes deaf drivers are unsafe because of the supposed need for spoken communication between driver and trainer in emergency situations. *See* Interrogatory

---

[7] *Tate* also reminds that the employer must justify any qualification standard beyond DOT requirements is justified by "business necessity." 268 F.3d at 993. That defense requires Werner to show that its standard is "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a); 29 C.F.R. § 1630.15(b)(1); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996–97 (9th Cir. 2007) (en banc); *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit*, at p. 9–38 (2021). That brings us back to the issue of reasonable accommodation. The evidence shows that Deuschle and Robinson had a valid Hearing Exemption that Werner itself recognizes, and they could complete the training with reasonable accommodations.

[8] Plaintiffs do not concede that Werner can prove, as a matter of law, that its training program is an essential function. See Section V.B.2.a below. For purposes of this section, Plaintiffs assume the training program is an essential function, but it is a fact for the jury to decide.

No. 5 response, Ex. 33 at 3 ("For instance, if there is a hazard a trainer observes that he needs to immediately warn the student driver about, that cannot be done efficiently and effectively through sign language, message cards, or other non-verbal communications."). Werner has not challenged Deuschle's or Robinson's ability to safely perform any other part of the training.

Werner claims that the accommodations available are not reasonable for two reasons: "they would not enable Plaintiffs to safely complete the training program and they would require a fundamental alteration in the nature of the training program." Def. BIS at 26. Werner's position that deaf drivers cannot safely receive instructions through non-verbal means is also part of their "direct threat" defense.

      a.   There is ample evidence that Deuschle and Robinson could safely perform the driver job.

Deaf drivers such as Robinson and Deuschle can and do safely communicate through the use of non-verbal communication. PSOMF ¶¶ 1–3. Three categories of evidence establish the safety of possible accommodations. First, Plaintiffs' experts. Second, the testimony of other trucking companies that routinely train deaf CDL holders. And third, Robinson's and Deuschle's own testimony and personal experiences.

Both of Plaintiffs' experts detail many safe, routine accommodations available for deaf drivers. Don Olds, who runs a training school and teaches deaf drivers himself, described the short-duration, one-handed signals which he employs with deaf drivers. Ex. 12 at 10; PSOMF ¶¶ 1–5. Olds also effectively uses small red, yellow, and green flags with simple instructions like "go," "stop," and "caution" on them. PSOMF ¶ 1. Spiral bound flashcards, tabbed and easy to access, are also available. Ex. 12 at 11; PSOMF ¶ 1. All these methods are safe and effective. All can use peripheral vision to avoid taking eyes off the road. None require more than a glance, the same as using a mirror, reading a road sign, adjusting the radio, checking the time, or glancing at

a GPS or map, all of which are safe. PSOMF ¶ 2. In addition, Olds clarifies that these methods are actually preferable to spoken commands because they are clearer and simpler. PSOMF ¶ 3.

Similarly, Dr. Steven Arndt—a Ph.D. industrial engineer with a specialty in human factors—recommends the use of hand signals while training deaf drivers. Ex. 13 at 53; PSOMF ¶ 1. Electronic displays such as an iPad mounted on the dash in front of the driver would allow for instantaneous communication with a deaf driver. PSOMF ¶ 4. Also, heads-up displays are available that project images onto the windshield in a manner that does not obstruct the driver's view, allowing a deaf driver to never have to take his eyes off the road even for the briefest of moments. PSOMF ¶ 5.

Plaintiffs' experts are not speculating. Many of the accommodations they recommend are used routinely by other trucking companies. Representatives for Covenant Transport, Western Express, Swift Transportation, C.R. England and Crete Carrier all testified that the companies have successfully trained deaf CDL-holders in their new-driver programs. PSOMF ¶ 6. And all have used one or a combination of the non-verbal communication methods recommended by Olds and Dr. Arndt. PSOMF ¶ 7. For example, Crete Carriers trained Deuschle using simple gestures or hand signals and the occasional short, written sign. Ex. 18 at 83:9–17; 84:7–12; PSOMF ¶ 15. Covenant trainers have communicated with deaf drivers by using simple signs and gestures. Ex. 33 at 19:13–20:5; PSOMF ¶ 7. Western Express has used both color-coded cards and hand signals. Ex. 15 at 16:14–17:14; 21:12–22:6; PSOMF ¶ 7. And Swift has used hand signals and flash cards. Ex. 17 at 13:21–14:19; PSOMF ¶ 7. In all, the training provided by all these companies demonstrates that not only are successful accommodations possible, but they can be readily incorporated into training programs similar or nearly identical to Werner's. Additionally, Werner operates Roadmaster driving school, which utilizes non-verbal

29

communication methods to train deaf drivers in over-the-road training. PSOMF ¶¶ 8– 9. Finally, the Court need not wonder if it was possible to safely train Deuschle and Robinson. Both men successfully completed new driver training with observed over-the-road components at other companies. PSOMF ¶¶ 10, 13–14.

Plaintiffs' evidence shows that Werner's purported safety concerns are unfounded and a pretext for discrimination. There is ample evidence to establish that training deaf CDL holders is both safe and effective—it also happens routinely. PSOMF ¶¶ 1–7, 9–15, 18. At a minimum there are fact issues on this point such that the claim should go to the jury.

**B. The Plaintiffs, not Werner, are entitled to summary judgment on the "direct threat" defense, and "direct threat" arguments do not obviate Deuschle's and Robinson's qualifications.**

Werner has been unable to articulate any actual safety risk posed by deaf drivers like Deuschle and Robinson beyond its own unfounded fears and speculation. In relying on certain cases, Werner inappropriately seeks, without foundation, to compare drivers with Hearing Exemptions to drivers who may lose consciousness or could not maintain their CDL. *See Anderson v. Norfolk S. Ry. Co.*, No. 21-1735, 2022 U.S. App. LEXIS 9604 (3d Cir. Apr. 11, 2022) (heart condition that causes unexpected loss of consciousness); *EEOC v. Schneider Nat'l Inc.*, 481 F.3d 507 (7th Cir. 2007) (nervous system disorder that causes fainting); *Witchet v. Union Pac. R.R. Co.*, 8:18CV187, 2020 U.S. Dist. LEXIS 260843 * (D. Neb. Feb. 21, 2020) (stroke event that could lead to seizures; employee also could not maintain CDL necessary for the position). Deaf drivers can receive CDLs. Comparing hearing exemption holders to drivers who may become incapacitated requires, at a minimum, an unfounded inference in Werner's favor. Werner argues that it is entitled to determine how much risk it is willing to take, but it must show that the risk exists in the first place.

30

"In the Eighth Circuit, an employer's safety concerns are **not part of the prima facie** case for disability discrimination, but whether an individual poses a danger to himself or others is relevant for evaluating the employer's affirmative defense of direct threat." *Baker*, *v. Union Pac. R.R. Co*., 580 F. Supp. 3d 647, 658 n 2 (D. Neb. 2022) (emphasis added) (citing *EEOC v. Wal-Mart*, 477 F.3d 561, 571–72 (8th Cir. 2007). As an affirmative defense, the employer "bears the burden of proving direct threat[.]" *Wal-Mart*, 477 F.3d at 571–72 (citing cases). While a "direct threat" defense is included in the ADA, *see* 42 U.S.C. §§ 12111(3), 12113(b); *see also* 29 C.F.R. § 1630.2(r), "in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear," an employer must rely on "the best current medical or other objective evidence" at the time it makes the employment decision if it wants to preserve a direct threat defense. *Wal-Mart,* 477 F.3d at 571 (citations omitted); *Baker*, 580 F. Supp. 3d at 658–59.

In enacting the ADA, Congress recognized that employers often wrongly exclude persons with disabilities from employment because of misplaced concerns about safety or liability. *See* H.R. Rep. No. 485, 101st Cong., 2d Sess., Pt. 3, at 30–31 (House Judiciary Comm.). Accordingly, an employer's good-faith belief that an employee posed a direct threat is insufficient to establish the direct threat defense. *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998) (employer's "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability; . . . [and] courts should assess the objective reasonableness of the [employer's] views").

To succeed on the defense, the employer's contemporaneous individualized assessment must establish the worker posed "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Wal-Mart*, 477 F.3d at 571 (quoting 42 U.S.C. § 12111(3)); *see also Sanders v. Union Pac. R.R. Co.*, No. 4:20CV3023, 2022 U.S. Dist. LEXIS

31

147440, at *9 (D. Neb. Aug. 17, 2022) (defendant-employer is "required to disprove that a reasonable accommodation … would have resolved any safety or business-related issues"). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Wal-Mart*, 477 F.3d at 571 (internal quotes omitted). The analysis requires "an individual assessment of the individual's ability to perform safely the essential functions of the job." *Huntley v. Watts Elec. Co.*, No. 4:21-CV-3002, 2022 WL 2715957, at *6 (D. Neb. July 13, 2022). And because of the "prejudice, stereotypes, [and] unfounded fear" surrounding many disabilities, *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 (1987), the legal standard for establishing a direct threat defense is high.

The ADA regulations further explain that the employer must show that there is a "significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). "Significant risk" means a "high probability of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. pt. 1630 app. § 1630.2(r). Finally, the direct threat defense must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002), *citing* 29 C.F.R. § 1630.2(r); *Wal-Mart*, 477 F.3d at 571.

Here, Werner claims that Jamie Maus inquired into studies on the safety of training deaf drivers and found no such studies existed. Def. SOMF ¶¶ 46–52. But Maus's inquiry could hardly have been more perfunctory—extremely brief, no names, no notes, and ignoring obvious sources. PSOMF ¶¶ 16–17. It certainly did not reveal the "best available objective evidence." And pointing to a lack of information, or an employee's inability to locate information, does not

32

prove deaf drivers pose any danger, or that a direct threat existed. As argued in Plaintiffs'

Motions for Summary Judgment, Werner's direct threat defense should fail as a matter of law

because Werner did not conduct any individualized assessment based on medical or other

objective evidence at the time it rejected Deuschle and Robinson for employment. *See*

8:18cv329, Plaintiffs' Brief in Support of Motion for Partial Summary Judgment (Deuschle BIS),

at 33–37; 8:18cv462, Plaintiff's Brief in Support of its Motion for Summary Judgment

(Robinson BIS), at 27–32. Additionally, Werner cannot show that under the four relevant factors

Deuschle and Robinson posed a significant risk to the health or safety to themselves or others

that could not be eliminated by reasonable accommodation. *See id*. At a minimum, it is an issue

of fact for the jury to determine whether Maus made these inquiries —actions she never

documented, did not have any witnesses for, and which involved people she could not identify

(PSOMF ¶¶ 16–17)—and whether Werner fulfilled its statutory duty to base its decision "on the

most current medical knowledge and/or the best available objective evidence" and conducted the

required "individualized assessment."

      Even if Werner could show it conducted any individualized assessment of Deuschle and

Robinson, it cannot show that these two individuals posed a significant risk of harm that could

not be eliminated by reasonable accommodation. To show this, Werner needs to prove this

"significant risk" in light of the four factors mentioned above. *See Wal-Mart*, 477 F.3d at 571.

Werner has not produced any evidence to prove deaf drivers' participation in the over-the-road

portion of their training program would have posed a significant risk in light of these factors.

      There is no evidence that Deuschle and Robinson were likely to have an accident that

would cause severe harm, or that the harm would have been imminent, if Werner had allowed

them to participate in their over-the-road training program. As fully licensed drivers, they had the

same education, underwent the same training, passed the same test, and met the same criteria as

hearing drivers. PSOMF ¶¶ 18–19. The only difference in their credentials is they had a lawful

exemption to the CDL hearing requirement. PSOMF ¶ 19. Werner can point to no evidence that

Deuschle and Robinson were personally more likely to cause an accident or other safety incident

than any hearing driver. In fact, other deaf drivers have been safely and successfully trained in

other major interstate trucking companies' training programs and truck driving schools,

including ones approved and owned by Werner, since 2013, without any evidence of an

increased risk of harm. PSOMF ¶¶ 6, 8–9.

1. Werner relies on disputed facts to argue that accommodating Robinson and Deuschle would require a "fundamental alteration" of its driver training.

The suggested accommodations did not fundamentally alter the training programs of

other trucking companies. PSOMF ¶¶ 6–7, and they wouldn't for Werner either. Werner does not

clearly identify any "fundamental" alteration non-verbal communications would cause. Instead,

without factual support, it asserts in conclusory fashion that non-verbal communication cannot

be used to "fine-tune safe habits" and "would remove the benefit of contemporaneous minute-

by-minute training for inexperienced drivers." Def. BIS at 26. Though Werner may argue that its

new drivers benefit from constant conversation while driving with trainers, receiving instruction

every minute is not an essential function. It is not even mentioned in the training handbook to

which Werner cites for this proposition. *See* Def. BIS at 26; Doc. 266-2 (Handbook) at 20–22. It

is also, itself, distracting. Ex. 10 at 4; Ex. 32 at 21:25–22:23 ("with any trainer regardless of

hearing-impaired or an exemption driver or non-hearing-impaired driver, … a professional

trainer doesn't want to have a conversation at the time of any driver behind the wheel"). Werner

also asserts without factual support that "Plaintiffs' only proposed solution for addressing an

unforeseen emergency is for the trainer to instruct the driver to stop and pull over immediately."

Def. BIS at 26. In fact, Olds discusses extensively in his report how he would, and has, handled emergency situations while training inexperienced deaf drivers. Ex. 12 at 24. And Dr. Arndt describes multiple accommodations that would allow for immediate communication in an emergency. Ex. 13 at 54, 67.

Further, Werner admits that it hires drivers who have received only non-verbal instruction. Def. SOMF at ¶ 74. That is inconsistent with its claim that non-verbal instruction cannot teach drivers necessary skills or fine-tune safety habits. Moreover, Werner has argued in this case that drivers with Hearing Exemptions—who necessarily have received non-verbal instruction—are just as safe operating CMVs as hearing drivers. Br. in Supp. of Def. Mot. to Exclude Expert Testimony, Doc. 247 at 11 ("Werner does not dispute that an FMCSA Hearing Exemption holder who already has sufficient driving experience to bypass Werner's placement driver training program and drive solo, without a trainer, could perform the essential functions of an interstate driver, with or without an accommodation, in a safe, efficient, timely, and legal manner."). Its own contradictory position creates a fact issue as to whether the accommodations were reasonable.

2. Whether Werner's training program is an essential function is a disputed question of fact.

Essential functions are the "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). "To the extent that an employer challenges an ADA plaintiff's claim that he can perform the job's essential functions, the burden of production is on the employer to come forward with evidence of those essential functions." *Baker*, 580 F. Supp. 3d at 657 citing *Wal-Mart*, 477 F.3d at 568. Accordingly, Werner must prove the completion of its training program is an essential function. But it does not appear in its job description, and Werner admits that, depending on the applicant's experience, it does not require all drivers to complete its training

35

program. *See* Position Description attached to Defendant's Motion for Summary Judgment, Doc.

266-10.

Courts employ a multi-step analysis in determining essential functions. The employer's

judgment is "highly probative," *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th

Cir. 2013), but "the employer's judgment is not conclusive." *Minnihan v. Mediacom Comm.*

*Corp.*, 779 F.3d 803, 812 (8th Cir. 2014). In addition, the court looks to the following factors:

> (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job
> descriptions prepared before advertising or interviewing applicants for the job;
> (iii)[t]he amount of time spent on the job performing the function; (iv)[t]he
> consequences of not requiring the incumbent to perform the function; ... [and]
> (vii)[t]he current work experience of incumbents in similar jobs.

*Id.* at 810 (citing *Kallail v. Alliant Energy Corp. Serv., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012)

(alterations original to *Minnihan*).

The trainer is required to observe the student driver in over-the-road training for just a

small portion (30 hours) of the driving hours, PSOMF ¶ 21, and no observation hours are

mandated for advanced placement or experienced drivers. PSOMF ¶ 21. And both Robinson and

Deuschle successfully completed new driver training elsewhere. PSOMF ¶¶ 10, 13. In

Deuschle's case, he applied to Werner having already driven nearly five months for C.R.

England. PSOMF ¶ 22. Werner admits that it would now consider him an experienced driver

with no need for training. PSOMF ¶¶ 22–23. The fact finder could find that "the amount of time

spent on the job performing" Werner's training is minimal and that the "consequences of not

requiring" the function would have little, if any, consequences.

3.  Werner's alleged essential function is a moving target.

Werner first claims that successfully completing training is an essential function, then

claims that "an employee's ability to engage in contemporaneous communications without

diverting his eyes from a necessary subject *may be* an essential function." Def. BIS at 25 citing *Barnhart v. Wal-Mart Stores, Inc.*, 206 F. App'x 890, 892 (11th Cir. 2006) (emphasis added) (deaf individual not qualified for loss prevention job that required two-way communication via walkie-talkies and intercoms while maintaining consistent eye visual contact with suspected shoplifter). Nothing in Werner's training materials supports that or includes assessment or evaluation of diverting eyes from the road, and nothing suggests it cannot ever be done during trainer instruction. Doc. 266-2 (Handbook), at 20–22. And there is no evidence of any requirement that trainees must never look at trainers while driving, or how long trainees' eyes should linger on gauges, mirrors, or the like. Werner previously only identified this as a safety issue, not an essential function. Now, Werner claims that communication must be performed in the same way hearing individuals do it, in direct contravention of the ADA. "Were [courts] to give conclusive weight to the employer's opinion on this issue ... any employer ... would escape ADA and MHRA liability simply by defining job duties in a manner that excludes disabled employees." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 787 (8th Cir. 2004). In fact, accommodations existed to allow Robinson and Deuschle to complete the over-the-road training, whether an essential function or not, without creating a danger. PSOMF ¶¶ 1–5.

In addition, Werner relies on easily distinguishable cases that found training programs essential because they were required of all employees, regardless of experience. *See Quick v. City of Fort Wayne*, No. 1:15-CV-056 JD, 2016 U.S. Dist. LEXIS 131868, at *10 (N.D. Ind. Sep. 27, 2016) (police training); *Robert v. Carter*, 819 F. Supp. 2d 832 (S.D. Ind. 2011) (weapons training); *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255 (10th Cir. 2009) (physical tetsting for those who work with inmates); *Howard v. UPS*, 101 F. Supp. 3d 343 (S.D.N.Y. 2015) (company training for all promoted drivers). Werner cannot rely on these cases to prove, as a matter of law,

that its training program was an essential function when it allowed certain drivers to bypass this requirement entirely. It makes no sense that something is an essential function when it is not required of everyone in the position, but that is Werner's claim.

### C. The Plaintiffs, not Werner, are entitled to summary judgment on the "business necessity" defense.

1. Legal standard for "business necessity" affirmative defense.

Unlawful discrimination includes "using qualification standards … or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard … or selection criteria … is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6); 29 C.F.R. §§ 1630.10(a) and 1630.15(b)(1). The defendant must also show that the essential functions cannot be accomplished by reasonable accommodation. 42 U.S.C. § 12113(a); 29 C.F.R. § 1630.15(b)(1); Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit, at p. 9–38 (2021). A qualification standard that screens out an individual with a disability violates the ADA unless the employer can prove a valid "business necessity" defense. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 994 (9th Cir. 2007) (en banc). To establish a qualification standard is a "business necessity," an employer must prove the standard "fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Harris v. Union Pacific R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020).

The business necessity defense "cannot be based on unfounded fears or uninformed attitudes about the disability." *Verzeni v. Potter*, 109 F. App'x 485, 491 (3d Cir. 2004). And "[f]or a safety qualification to meet the business necessity defense, it must be based on current medical knowledge about the disability and on the real risks that the disability may present." *Id*. And, as with direct threat, even an employer's good faith actions will not save it if the employer

is misinformed about the realities of the disability. *Verzeni*, 109 F. App'x at 491–92. The fact that the employer may have acted "responsibly and reasonably … does not satisfy the business necessity defense. There is no good faith defense to discrimination, and such discrimination does not have to be overt or hostile to be actionable." *Id.* at 492–93.

> 2.   Applying the law to the facts of this case, Werner cannot prove its business necessity defense as a matter of law. [9]

Here, Werner has alleged a business necessity defense and claims the "qualification standard" is that student drivers "complete a training program, including through communicating with their trainer without taking their eyes off the road." Def. BIS at 30. According to Werner, this necessarily excludes all deaf drivers from training.[10] To support this defense, Werner relies on general hazards of the position and unsupported assumptions and stereotypes regarding deaf drivers' ability to receive instruction safely through non-verbal means.

Werner's defense fails, or at least has disputed issues of material fact, for several reasons. First, with reasonable accommodation, deaf drivers can receive instruction without taking their eyes off the road, including in emergency situations while driving. PSOMF ¶ 5. Second, to the extent they may take their off of the road to receive an instruction, it is a glance no longer than to look at a mirror or gauge. PSOMF ¶ 2. Third, "communicating with their trainer without taking their eyes off the road" is not really a qualification standard as there is no evidence that Werner actually uses it to screen applicants. Werner simply asserts the requirement now, in litigation, as

---

[9] Plaintiffs also assert that summary judgment should be granted to preclude assertion of the business necessity defense in these cases. Deuschle BIS p. 37–40; Robinson BIS p. 32–34.

[10] Werner expresses no concern about deaf drivers—or anyone else—looking away from the road except in the context of deaf drivers communicating with trainers. Because Werner presumes that conveying instruction to deaf drivers will necessarily distract them, Werner requires that a driver must hear to complete their training program.

a reason to not hire applicants with Hearing Exemptions. Werner assumes that all hearing drivers never take their eyes off the road, which of course is untrue and without evidentiary foundation.

Further, Werner suggests that in-cab communication between driver and trainer is required for more than just emergency situations. *See* Def. BIS at 30–31. But all the information included in the training program can be communicated while the student driver is not driving, and Werner has never claimed that anything other than "split second" decisions required real-time verbal communication. Ex. 9 at 189:8–15. Nor could Werner claim anything else. For example, part of the student driver training program includes "fueling procedures and fuel card usage," "drivers' daily log and MPC200 logging," "proper coupling and uncoupling procedures," and "accident packet and reporting of accidents." Doc. 266-2 (Handbook) at 20. Any of this could be communicated at breaks and stops, obviating the concern that drivers will be distracted by such conversations. Even safety training, like the Smith System training that Werner utilizes, can be effectively explained while not driving and then safely deployed while the trainee is behind-the-wheel. Ex. 12 at 22–23 (prior to driving "the sticker can be explained to the new driver and when the trainer points to the dash sticker and holds up a finger(s) 1-5, regarding the particular skill… [t]he driver could simply nod yes or no then the trainer would confirm the student is reminded of that previously taught skill and can also discuss it at the next break.").

Defendant also ignores the inherent distractions in conversations between hearing individuals while driving—distractions that are not possible for deaf drivers. "[W]hile it might be efficient to have Werner trainers use driving time to discuss things *generally* related to trucking with its hearing student drivers, these conversations are, by definition, distractions from immediate driving." Ex. 10 at 4 (emphasis original). Werner relies on *EEOC v. J.B. Hunt Transp., Inc.*, 128 F. Supp. 2d 117 (N.D.N.Y. 2001), to support its contention that the

40

requirement to "complete a training program, including through communicating with their trainer without taking their eyes off the road" is job-related and consistent business necessity. But the court never reached the business-necessity question because the plaintiffs in that cases did not dispute that a drug or medication screen to prevent impaired driving was required by DOT., *id*. at 136, and more fundamentally, the applicants did not have disabilities and could not prove a *prima facie* case. *Id.* at 135–36. Moreover, the company used its impaired-driver standard to screen *all* driver applicants "across-the-board," *id.* at 131, which is not true in the instant case.

### D. Disputed material facts make summary judgment inappropriate on EEOC's unlawful inquiry claim.

A "disability-related inquiry" is a question (or series of questions) that is likely to elicit information about a disability.[11] Werner's application does so by asking, "Is there any reason you might be unable to perform the functions of the job for which you have applied as described in the attached job description?" Ex. 5 at 3. Werner claims that it voluntarily changed its application to remove the offending question in July 2013 and has since destroyed copies of its prior application. But voluntary cessation does not deprive a federal court of its power to determine the legality of the practice. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Nothing prevents Werner from reinserting the question, or something similar, in the future. The claim is therefore not moot.

Werner also argues Count II is time barred because it asserts it stopped using the application with this question in July 2013. But Werner's claim that it has not made any unlawful disability-related inquiry through its employment application since July 2013 is not an

---

[11] Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations Under the Americans with Disabilities Act of 1990, 8 FEP Manual (BNA) 405:7191 at 4, 8 FEP at 405:7192 (1995). This and other ADA guidance documents are available at https://www.eeoc.gov.

undisputed fact. In February 2016, the EEOC asked Werner to provide "a blank copy of your employment application." Werner produced an application with the unlawful question. PSOMF ¶ 24. In September 2016, the EEOC asked Werner to provide "a copy of . . . all documents related to the recruiting process for the relevant time period" (defined as "January 1, 2014 to the present"). Werner again produced an application with the unlawful question. PSOMF ¶¶ 25–26. Self-serving contradictory testimony – offered years after these productions were made – creates a disputed fact, not an undisputed one. Because the time the application was changed is in dispute and voluntarily cessation of an illegal policy does not make it moot, Werner's motion as to Count II should be denied.

### E. Disputed material facts make summary judgment inappropriate on EEOC's unlawful classification claim.

The ADA prohibits "classifying a job applicant … in a way that adversely affects the opportunities or status of such applicant … because of the disability of such applicant." 42 U.S.C. § 12112(b). The EEOC alleges, and Werner admits, that Werner has a practice of classifying deaf drivers differently when they apply for employment. Since at least December 17, 2018, Werner has utilized a specific policy for how to handle deaf drivers' applications. Doc. 266-11 (FMCSA/MCSA-5870 Process). For non-deaf drivers, Werner automatically pre-approves a driver's initial application and extends a conditional job offer when the applicant meets Werner and DOT standards. PSOMF ¶¶ 27–28. But for deaf drivers (or even suspected deaf drivers) who meet these same standards, Werner does not pre-approve their application or make a conditional job offer. Doc. 266-11. Instead, recruiters must send these applications to a "manager basket" and ""[m]anagement will determine whether to move forward or not." Doc. 266-11.

Werner claims that rather than adversely affecting the opportunities or status of deaf applicants, as alleged by the EEOC, this classification process exists to ensure those applicants meet FMCSA physical qualifications and assess whether "a reasonable accommodation would enable the applicant to perform all essential job functions." Def. BIS at 33–34. EEOC disputes Werner's alleged justification. First, a driver with an FMCSA hearing exemption *does* meet all FMCSA requirements. Just as recruiters review applicants' other credentials to determine their qualifications, recruiters (and anyone else) can review an FMCSA hearing exemption (and look up the driver's name in the Federal Register) to confirm the exemption is valid. It is not credible that this assessment is somehow different from checking any other credentials. Second, Werner clearly does not (as it claims in Def. BIS at 33–34) use this process for the purpose of assessing whether a reasonable accommodation would enable deaf applicants to perform essential job functions. The company admits it refuses to provide reasonable accommodation to deaf driver trainees. It is disingenuous for Werner to claim it classifies deaf applicants for the purpose of assessing their need for reasonable accommodation when it will never provide them such accommodation.

Through this process, Werner classifies deaf applicants by denying them preapproval of their applications and the conditional offer of employment that comes with it, even if they satisfy all the basic requirements. PSOMF ¶¶ 27–28; Doc. 266-11. This policy violates 42 U.S.C. § 12112(b) by first "classifying" deaf applicants, and then treating them worse than non-disabled applicants by denying them the preapproval that hearing applicants receive.

**VI.    Conclusion**

43

Based on the extensive evidence and reasons described above, at the very least there exist factual disputes on each of the grounds in Werner's motion, and it should be denied in its entirety.

Respectfully submitted,

*/s/ Meredith S. Berwick*
Meredith Berwick, MO Bar #64389
Equal Employment Opportunity
 Commission
1222 Spruce Street, Room 8.100
St. Louis, MO 63103
Phone: 314-798-1909
Fax: 314-539-7895
meredith.berwick@eeoc.gov

Joshua M. Pierson, KS Bar #29095
Equal Employment Opportunity Commission
400 State Avenue, Suite 905
Kansas City, Kansas 66101
Phone: (913) 359-1807
Facsimile: (913) 551-6957
joshua.pierson@eeoc.gov
*Attorneys for Plaintiff*

*/s/ Brian East*
Brian East, TX Bar # 06360800
(Admitted Pro Hac Vice)
Disability Rights Texas
2222 West Braker Lane
Austin, Texas 78758
Phone: 512-454-4816
Fax: 512-454-3999
beast@drtx.org

Lia Sifuentes Davis, TX Bar # 24071411
(Admitted Pro Hac Vice)
University of Texas School of Law
Civil Rights Clinic
727 East Dean Keaton Street
D1800
Austin, Texas 78705
Phone: 512-232-7222
Fax: 512-232-0800

44

lia.davis@law.utexas.edu
*Attorneys for Plaintiff-Intervenor Andrew Deuschle*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 12,809 words, which includes all text, including

the caption, headings, footnotes, and quotations, as determined by Microsoft Word for Office

365 ProPlus.

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, I electronically filed the foregoing document
with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all
counsel of record.

*/s/ Meredith S. Berwick*