IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | **CASE NO.: 8:18cv462** |
| Plaintiff, | |
| v. | **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S REQUEST FOR EQUITABLE RELIEF** |
| DRIVERS MANAGEMENT, LLC AND WERNER ENTERPRISES, INC., | |
| Defendants. | |

## I.    INTRODUCTION.

Plaintiff Equal Employment Opportunity Commission ("Plaintiff") seeks an award of $81,100 in backpay and prejudgment interest to Victor Robinson for a period of over four years after Robinson applied to Werner and broad-ranging injunctive relief which far exceeds the position for which Robinson applied and the claims at issue in this case. Plaintiff's requested relief is unsupported by the evidence and contrary to pertinent case law. This case involved a single truck driver applicant who applied with Werner in February 2016 and found a comparable driving position within weeks after Werner declined to hire him. Thereafter, Robinson repeatedly left higher paying jobs in favor of lower paying jobs for personal reasons, such as his desire to be home more frequently. He was also fired by another motor carrier for "cause" due to an unacceptable safety record. In light of this undisputed evidence, Plaintiff's request for back pay through May, 2020 is inappropriate and unreasonable. Werner submits that any award of backpay should be capped at six months, when Robinson voluntarily left his first subsequent over-the-road driving position in favor of a local driving job, and should, in no event, extend beyond August, 2018, when Robinson was fired for cause by another motor carrier.

Plaintiff's request for back pay damages after 2019 should also be denied because Plaintiff has provided no justification for waiting until the eve of trial to disclose damage calculations for the period from January – May, 2020. Plaintiff's belated disclosure necessarily prejudiced Werner in its ability to meaningfully dispute those calculations. Similarly, because Plaintiff did not identify prejudgment interest as a category of relief sought in the pretrial order, Plaintiff has waived any such claim for that relief.

Plaintiff's request for broad-ranging injunctive relief should similarly be denied because injunctive relief is inappropriate and unwarranted under the facts of this case. Plaintiff pursued this case on behalf of a single claimant who never reapplied to Werner after Werner declined his application in February 2016 and left the industry altogether in 2020. Plaintiff did not pursue a pattern-and-practice case and should not be allowed to expand the scope of the case now, through broad-ranging injunctive post-trial relief. Nor has Plaintiff established a pattern-or-practice of discrimination. To the contrary, only two months before the jury verdict came down in this case, another jury empaneled before this Court found Werner did *not* discriminate against Andrew Deuschle, another deaf driver applicant who applied for the exact same position as Robinson. (Case 8:18-cv-329, Filing 342, *Deuschle* Verdict Form). Similarly, there was evidence at trial that Werner has accommodated other disabled individuals in the past, including deaf drivers. On this record, Plaintiff has not established a threat of future irreparable harm as required to warrant injunctive relief. Moreover, the non-monetary relief requested by Plaintiff goes far beyond the employment practices challenged in this case and is unwarranted by the facts and contrary to existing law.

Werner requests that any award of backpay be limited to $6,461.00, for the first six months after Werner declined to hire Robinson, and requests the Court deny Plaintiff's requests for prejudgment interest and injunctive relief.

## II.   ANY AWARD OF BACKPAY SHOULD BE LIMITED. PLAINTIFF'S BACKPAY CALCULATIONS IGNORE ROBINSON'S FAILURE TO MITIGATE HIS DAMAGES AND ARE BASED ON UNREASONABLE ASSUMPTIONS THAT ARE CONTRARY TO THE EVIDENCE.

Although Plaintiff requests back pay for Robinson through May 2020, the Court should exercise its discretion to limit the back pay period to the first six months after Werner declined to hire Robinson. Werner respectfully submits Robinson is not entitled

to back pay after August, 2016, when he quit the first of seven trucking jobs for personal reasons, because Werner should not shoulder the financial consequences of his decisions to voluntarily part ways with comparable employers. Total backpay computed through that date is $6,461.00.[1] Alternatively, because Robinson never held any commercial trucking job for more than 1 year, the back pay period should be cut off no later than February, 2017, one year after Robinson applied to Werner. Total backpay computed through that date is $6,719.79.[2] At a bare minimum, Robinson's backpay damages should be cut off in August 2018, when he was terminated for "cause" by Marten Transport for a violation of company policy. Total backpay computed through that date is $19,554.35.[3] Any additional award of backpay to Robinson, over and above those amounts, would provide a windfall to Robinson and inequitably force Werner to bear the financial burden of Robinson's failure to mitigate his claimed damages and his misconduct

---

[1] Adams estimated Robinson would have earned an annual salary and medical benefits of $43,635.18 at Werner in 2016. (Exhibit 86 at p. 6). Prorated from February 15, 2016, through September 2016, Adams estimated Robinson would have earned $27,271.99 through September 2016 at Werner, less earnings at Covenant of $20,810.99, equals $6,461.00. (Exhibit 86, p. 10).

[2] Adams estimated Robinson would have earned an annual salary and medical benefits of $43,635.18 at Werner in 2016, and $58,467.91 in 2017. (Exhibit 86 at p. 6). Robinson's prorated salary and medical benefits at Werner from February 15, 2016, through December 2016 were $38,180.78. His earnings and medical at Covenant ($20,810.99), XPO ($675), and US. Xpress ($9,975) were $31,460.99, resulting in back pay damages in 2016 of $6,719.79 through 2016. (Exhibit 86 at p. 10). According to Adams, Robinson's prorated salary and medical benefits at Werner from January 1 through February 15, 2017 ($7,308.49) would have been less than his prorated salary and medical benefits at U.S. Xpress from January through February 15, 2017 ($7,909.38), indicating Robinson had fully mitigated his damages as of January 2017. (Exhibit 86 at p. 6, 10).

[3] Adams estimated Robinson would have earned an annual salary and medical benefits at Werner of $43,635.18 in 2016, $58,467.91 in 2017, and $59,191.61 in 2018. (Exhibit 86 at p. 6). Robinson's prorated salary and medical benefits from February 15, 2016, through December 2016 ($38,180.78); 2017 salary and medical benefits ($58,467.91); and prorated salary and medical benefits from January through August 2018 ($39,461.07) would have totaled $136,109.76. (Exhibit 86 at p. 6). His earnings and medical in 2016 at Covenant ($20,810.99), XPO ($675), US. Xpress ($9,975); in 2017 at U.S. Xpress ($21,091.67) and J.B. Hunt ($35,776.00); and in 2018 at J.B. Hunt ($2,286.00) and Marten Transport ($25,940.66) equal $116,555.41, resulting in back pay through August 2018 of $19,554.35. (Exhibit 86 at p. 10).

while working for a subsequent employer. Similarly, although Plaintiff's expert computed alleged back pay damages for certain withdrawals Robinson made from his 401(k) and "missed" matching contributions, Plaintiff offered no evidence demonstrating those claimed damages were in any way attributable to Werner's refusal to hire him.  Plaintiff's request for those damages should be denied.

### a. Applicable legal standards.

Back pay awards are intended to make a person whole for injuries suffered due to discrimination and are premised on the notion the employee would have remained in the specified position at the designated rate of pay, absent the challenged hiring decision. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417-18 (1975). The back pay period generally runs from the date of the challenged employment decision. *See Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 373 (8th Cir. 1974). However, because back pay is not intended to provide a windfall, back pay is properly terminated when the plaintiff no longer suffers the economic effects of the employment decision, such as when a plaintiff obtains a comparable position or higher paying employment. *See id.* (back pay damages are the difference between what the applicant would have received in specific monetary benefits prior to trial had he been hired less whatever he received in wages if he secured [subsequent] employment).

Because back pay awards are not intended to provide a windfall, the claimant "has a duty to mitigate damages by exercising reasonable diligence to locate other suitable employment and maintain a suitable job once it is located." *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992). A "claimant who voluntarily quits comparable, interim employment fails to exercise reasonable diligence in the mitigation of damages," unless the resignation is prompted by unreasonable working conditions or the earnest search for better paying employment. *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985) (internal citations omitted). A claimant similarly fails to mitigate damages by voluntarily terminating employment for personal reasons. *Brady*, 753 F.2d at 1278; *Delight Wholesale Co.*, 973 F.2d at 670. The accrual of backpay damages will also be tolled if a plaintiff is terminated from a new position for "cause." *Brady*, 753 F.2d at 1277-79 ("the tolling of the back pay period following a voluntary quit should also apply to those terminations which result from a violation of an employer's rules"); *see also, e.g.*,

4

*Grace v. City of Detroit*, 216 F. App'x 485, 492-93 (6th Cir. 2007) (cutting off back pay following the plaintiff's termination for misconduct); *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 937 (5th Cir. 1996) (vacating district court award of backpay for the period following the plaintiff's termination from a subsequent employer). Any other result would inequitably force the defendant to pay for the claimant's personal decisions to leave subsequent employment or his misconduct at subsequent employers, both of which are inconsistent with the "make whole" objective of back pay. *Brady*, 753 F.2d at 1277.

### b. Robinson is not entitled to backpay through May, 2020.

#### i. *Robinson repeatedly left jobs for personal reasons and was terminated by another motor carrier for cause.*

The evidence offered at trial confirms Robinson failed to mitigate his damages because, after Werner declined to hire him, Robinson voluntarily left numerous subsequent trucking jobs without justification, repeatedly accepted lower-paying jobs for personal reasons, and was terminated for cause by one trucking employer. As further detailed below, Plaintiff's expert ignored this evidence in computing backpay. However, consistent with the authorities cited above, these actions confirm Robinson is not entitled to backpay through May, 2020. *Delight Wholesale*, 973 F.2d at 670.

On or around February 15, 2016, Robinson learned he would not be hired by Werner. (Filing 348, October 4, 2023, Trial Transcript (hereinafter "October Transcript") 7:12-14). In March, 2016, Robinson took a job as an over-the-road driver for Covenant Transport. (October Transcript 7:24-25). Robinson was hired as a team driver but later elected to transition to solo driving, a position which paid less than his team driver role. (October Transcript 69:15-20, 70:5-9, 71:23-72:4, 72:18-73:3, 98:24, 99:8-10). Robinson testified he no longer wished to drive as part of a team and wanted a "freeing experience" after sharing a cab with another team driver. (October Transcript 72:2-4, 98:24, 99:8-10). Robinson later quit Covenant in September, 2016, ostensibly because he was not making enough money. (October Transcript 8:7-9, 73:4-9). However, Robinson admits he elected to transition from a team driver to a solo driver about a month before quitting Covenant, although "you do make less if you are solo." (October Transcript 71:23-72:7, 72:18-73:3, 99:8-10). Accordingly, to the extent Robinson left Covenant in September 2016 "because [he] wasn't making enough money," that situation was solely attributable to his decision

to abandon the higher paying team driver role in favor of driving solo. (October Transcript 73:1-3).

After leaving Covenant, Robinson applied to Jacobson Transport and accepted a position on an account where he could be home every weekend. (October Transcript 9:14-20, 75:19-21). However, Robinson was laid off after only three weeks because Jacobson only had 13-speed trucks and he was not trained to drive a 13-speed. (October Transcript, 75:19-76:7). Moreover, his trainer at Jacobson did not feel comfortable trying to teach Robinson to operate this type of transmission. (Filing 322, Trial Transcript Vol. III, 416: 7-22). Robinson admitted he did not research the type of trucks Jacobson ran before he applied because he simply wanted a local driving job. (October Transcript, 75:19-76:7). In other words, after only a few weeks at Jacobson, Robinson once again found himself unemployed for reasons entirely of his own making.

Robinson next took a job with U.S. Xpress, where he worked as an over-the-road driver from October 2016 to April 2017, earning 46 cents per mile. (October Transcript 11:24-12:2, 76:14-16). Robinson drove a dedicated route for U.S. Xpress and was generally home on the weekends. (October Transcript, 76:10-13). However, Robinson quit U.S. Xpress in April 2017, and began looking for a local driving job in Indiana. (October Transcript 12:3-11, 76:21-77:2). Robinson primarily looked for local driving jobs after leaving U.S. Xpress because, by that point in his life, he wanted a job where he could be home every night. (October Transcript 78:4-15). However, Robinson admits he did not do any analysis into whether local driving jobs paid more or less than over-the-road driving jobs. (October Transcript 78:10-19). Ultimately, Robinson accepted a local job at J.B. Hunt that paid only 38 cents per mile – 8 cents less per mile than his last over-the-road position – because "they had a local route where [he] could be home every night[.]" (October Transcript, 78:4-9; 82:1-3). Robinson worked at J.B. Hunt from May 2017 until early 2018, when he quit because he got "stuck in Chicago" and the company "did not care about whether or not I was going to be able to get back home." (October Transcript 12:15-21, 13:20-14:4, 82:1-3, 85:24-86:22; Exhibit 179).

After quitting J.B. Hunt, Robinson took another local driving job with Marten Transport, earning 42 cents per mile. (October Transcript 51:12-14, 52:9-13, 87:8-10, 87:18-19). Because he wanted a local driving job, Robinson did not look for any over-the-

road jobs at that time and also did not investigate whether he could make more money driving over the road. (October Transcript 87:14-17). Robinson drove for Marten from January 2018 through August 2018, when he was terminated for violating company policy due to an accident. (October Transcript 92:18-24; Exhibit 180).

After Robinson was terminated by Marten Transport, he took a regional driving job with Stan Koch Trucking, where he worked from September 2018 - September 2019, earning 48 cents per mile. (October Transcript 53:16-18, 54:3-11, 93:11-13). However, Robinson voluntarily left Koch for a lower-paying job at Western Express in the fall of 2019 because he wanted to drive flatbed trucks. (October Transcript 53:16-18, 54:3-11). Robinson made only 40 cents per mile while driving for Western Express and remained at that job from October 2019 until May 14, 2020, when he stopped working as a commercial driver. (October Transcript 54:23-55:14, 94:14-16, 95:20-22).

In calculating Robinson's claimed backpay damages, Plaintiff's expert did not investigate why Robinson left any subsequent employers. (October Transcript 36:13-20). Instead, Plaintiff's expert simply calculated "the amount of money that Mr. Robinson would have been expected to earn at Werner" and subtracted "the amount of money he actually earned" from February 2016 through the end of 2019, computing alleged back pay damages of $52,330.37 for that period. (October Transcript 18:7-13, 20:22-21:2). Plaintiff's expert witness also inexplicably failed to account for the fact that Robinson sought a higher paying over-the-road position at Werner and then successively sought lower paying local driving positions, unlike the job he applied for at Werner. By doing so, Plaintiff's expert unfairly establishes a higher baseline for the wages Robinson "would have been expected to earn" and penalized Werner for Robinson's failure to seek out comparable employment after Werner declined to hire him.

Contrary to Plaintiff's expert's flawed assumptions, Robinson admits he voluntarily transitioned from a higher paying team driver job to a lower paying solo job with Covenant before quitting Covenant and thereafter repeatedly quit over-the-road driving jobs, such as J.B. Hunt and Stan Koch, in favor of lower paying jobs, such as Western Express, because he wanted to be home more frequently or wished to operate a particular type of truck. (October Transcript 12:15-21, 13:20-14:4, 53:16-18, 54:3-11; 71:23-72:7, 72:18-73:3, 82:1-3, 85:24-86:22, 99:8-10). Werner should not bear the financial burden of

Plaintiff's decisions to voluntarily reduce his compensation or abandon subsequent jobs for personal reasons. *See, e.g., Brady*, 753 F.2d at 1278 (a claimant fails to mitigate damages by voluntarily terminating employment for personal reasons); *Delight Wholesale Co.*, 973 F.2d at 670 (same); *EEOC v. New Prime, Inc.*, No. 6:11-cv-03367-MDH, 2015 U.S. Dist. LEXIS 166656, at *34-35 (W.D. Mo. Dec. 14, 2015) (cutting off plaintiff Poe's back pay period following her voluntary quit of comparable employment due to personal reasons and failing to seek another substantially equivalent position and cutting off plaintiff Smith's back pay because Smith had opportunities for similar employment but did not pursue due to her desire to work on a specific team). Similarly, awarding backpay for the period after Robinson was fired by Marten would inequitably "force [Werner] to pay for [Robinson's] misconduct" in a manner contrary to the "make whole" objective of back pay. *Brady*, 753 F.2d at 1277; *see also, e.g.*, *Grace v. City of Detroit*, 216 F. App'x 485, 492-93 (6th Cir. 2007); *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 937 (5th Cir. 1996).

Because Plaintiff's expert failed to consider Robinson's reasons for leaving subsequent jobs, Plaintiff's expert's damage calculations do not account for Robinson's failure to mitigate his claimed damages and are overstated and contrary to law. Any award of backpay should be cut off six months after Werner declined to hire Robinson, in or around August 2016, when Robinson voluntarily quit Covenant after electing to transition to a lower-paying solo driving job. Back pay through this period totals $6,461.00.

> ii.  *Plaintiff's expert assumed, contrary to the evidence, that Robinson would have remained continuously employed by Werner as an over-the-road driver from February 2016 through May 2020.*

Plaintiff's request for backpay through May, 2020 is also unreasonable because Plaintiff's expert unreasonably assumed Robinson would have remained employed at Werner from February 2016 – May, 2020. (October Transcript 36:9-12). This assumption is contradicted by Robinson's personal track record as a commercial driver and undisputed evidence regarding the average tenure of Werner drivers hired during the same time period.

Robinson never held any commercial driving job for more than 1 year. Moreover, although Robinson understood he would have been away from home for weeks at a time

if hired by Werner, Robinson left his first over-the-road job at Covenant after just six months and took a local driving job with Jacobson. (October Transcript 96:18-20). Robinson did not apply with any other carriers at that time because he wanted a local driving job. (October Transcript 75:3-21). Robinson thereafter frequently job-hopped and repeatedly left higher-paying over-the-road jobs for lower-paying local driving jobs. (October Transcript 12:15-21, 13:20-14:4, 53:16-18, 54:3-11; 71:23-72:7, 72:18-73:3, 82:1-3, 85:24-86:22, 99:8-10).  Plaintiff's expert also ignored the fact that Robinson was terminated by Marten Transport for "cause" in August, 2018, explaining it did not matter for purposes of his calculations whether Robinson was terminated from any particular employer. (October Transcript 36:13-20, 92:18-24; Exhibit 180). However, this undisputed evidence confirms the unreasonableness of Plaintiff's expert's assumption that Robinson would have worked for Werner continuously from February, 2016 – May, 2020.

That assumption is also contrary to discovery responses reviewed and relied upon by Plaintiff's expert in performing his calculations, which confirm less than half of all drivers hired around the same time period remained employed by Werner one year later. (October Transcript 37:25-38:8; Exhibit 177). Specifically, as set forth in Trial Exhibit 177, 497 drivers started driving for Werner during the first three months of 2015 but only 227 of those drivers (less than 50%) remained at Werner one year later and only 70 of those drivers (less than 15%) remained employed 4 years later. (October Transcript 40:8-17; Exhibit 177). It is speculative and unreasonable to assume Robinson would have continued working for Werner longer than the vast majority of drivers hired around the same time period, particularly when he never held any other driving job for more than one year. The driver turnover rate at Werner, coupled with Robinson's actual track record as a commercial driver, confirms back pay should be cut off after, at most, February 2017, one year after Robinson applied to Werner. Back pay through that period totals $6,719.79.

### c. Robinson is not entitled to recover damages for 401(k) distributions or alleged missed matching contributions from Werner.

Robinson is similarly not entitled to damages for taking early withdrawals from his 401(k) account because there is no evidence those withdrawals were necessitated by or related to Werner's decision not to hire Robinson. Although Plaintiff argues Robinson

incurred damages of $3,861.25 for early 401(k) withdrawals in 2016 and 2018, there is no evidence Robinson was forced to withdraw those sums because Werner declined to hire him in February, 2016. (*See* Exhibit 86, pp. 9, 11). To the contrary, Plaintiff's expert did not even know whether the 2016 distribution was made before or after Robinson was rejected by Werner and did not investigate why Robinson withdrew money from his retirement account in either instance. (October Transcript 43:22-45:14). Although Robinson claimed he made the 2016 withdrawal because he needed money after Werner declined to hire him, Robinson did not recall the amount he withdrew and it is undisputed he obtained employment with Covenant Transport within a few weeks after Werner declined to hire him. (October Transcript 6:21-7:25). Robinson did not remember taking *any* distributions in 2018 and, although it is unclear exactly when in 2018 he did so (if at all), it is undisputed Robinson worked for at least four other motor carriers (Covenant, Jacobson, U.S. Xpress and J.B. Hunt) between the date he applied to Werner and January 1, 2018 and he was fired by Marten Transport for cause in August 2018. (October Transcript 7:6-8, 9:14-20, 11:24-12:2, 55:16-19, 75:19-21, 76:14-16, 78:4-9; 82:1-3). On this record, there is simply no evidence from which this Court could conclude Robinson withdrew money from his retirement accounts in 2016 and 2018 as a consequence of Werner declining to hire him in February, 2016.

Robinson is similarly not entitled to damages for alleged missed 401(k) matching contributions. Although Plaintiff's expert assumed Robinson would have made 401(k) contributions at Werner, thereby entitling him to $2,577.27 in matching 401(k) contributions, he admitted that assumption is not supported by Robinson's actual track record at subsequent employers. (October Transcript 42:25-43:17; Exhibit 86, p. 6). Plaintiff's expert reached that conclusion based solely on Robinson's self-serving assertion that he would have made a 3 percent 401(k) contribution at Werner if he was hired. (October Transcript 42:25-43:17). However, Plaintiff did not offer any evidence that Robinson actually made retirement contributions in that amount while working for any other subsequent employer. Accordingly, Robinson should not be awarded back pay related to matching amounts for 401(k) contributions he did not make. For these reasons, Werner requests that any back pay award be capped at the first six months after Werner declined to hire Robinson.

III.    **PLAINTIFF WAIVED PREJUDGMENT INTEREST BY FAILING TO INCLUDE THAT ISSUE IN THE PRETRIAL ORDER.**

Plaintiff's claimed damages are also overstated because, although Plaintiff requests an award of prejudgment interest, Plaintiff did not include prejudgment interest as an issue in the Order on Final Pretrial Conference. (*See generally* Filing 286, Order on Final Pretrial Order). Accordingly, Plaintiff waived any claim for prejudgment interest. Because parties are required to raise "any factual issues… includ[ing] theories of damages" in a pretrial order, failure to "rais[e] the issue of what types of damages could be recovered … during the final pretrial conference" constitutes a waiver. *See Crabar/Gbf, Inc. v. Wright*, No. 8:16-CV-537, 2023 U.S. Dist. LEXIS 166069, at *9 (D. Neb. Sep. 19, 2023) (citing *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 831 (8th Cir. 2019), quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."). Consistent with this authority, Plaintiff is not entitled to prejudgment interest.

Plaintiff also failed to disclose all prejudgment interest calculations for back pay through 2019 prior to trial. (October Transcript 26:21-27:6). Moreover, Plaintiff also requests additional prejudgment interest on alleged back pay damages for the time period of January 1, 2020, through May 14, 2020. For the reasons stated below, prejudgment interest calculations beyond 2019 and prejudgment interest on alleged back pay damages through May 2020 should be excluded for the same reasons that undisclosed back pay damages should be excluded – they were never disclosed in advance of trial.

IV.    **EVIDENCE OF BACKPAY DAMAGES AND PREJUDGMENT INTEREST AFTER 2019 WAS NOT TIMELY DISCLOSED AND SHOULD BE EXCLUDED.**

The Court should similarly deny Plaintiff's request for backpay and prejudgment interest after 2019 because Plaintiff did not timely disclose those damage calculations. Werner objected to the introduction of testimony by Plaintiff's expert regarding damages and prejudgment interest after 2019, because Plaintiff did not disclose that Robinson was

seeking such damages until just prior to the August, 2023 trial, and did not disclose any calculations or expert opinions on that issue until October 4, 2023. (*Compare* Ex. 86, Report by Nathan Adams, at Table 5 *with* Filing 301, Plaintiff's Reply Brief in Support of Motions in Limine, p. 8 n.2 (stating in a footnote that Plaintiff would seek backpay damages through May 2020)). The Court reserved ruling on the admissibility of that expert testimony. (October Transcript, 28:5-29:14). Although Werner recognizes the Court previously reasoned Werner had not identified how the admission of that undisclosed evidence would harm or prejudice Werner (Filing 330, p. 3), Werner respectfully submits the testimony should be excluded because Plaintiff did not provide any justification for its failure to timely disclose the calculations until the eve of trial. Moreover, the failure was not harmless because Werner was deprived of an opportunity to meaningfully rebut those calculations by Plaintiff's failure to disclose those figures prior to trial.

Rule 26(a)(2) provides that a party must disclose the identity of any expert witness along with a written report of such expert, while Rule 26(e) imposes an obligation on the parties to supplement incorrect or incomplete information. *Petrone v. Werner Enters.*, 940 F.3d 425, 434 (8th Cir. 2019) ("*Petrone I*"). "The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in Rule 37." *Petrone I*, 940 F.3d at 434-35 (citing *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018); 8B Charles A. Wright, Arthur R. Miller et al., *Federal Practice & Procedure* § 2289.1 (3d ed. 2018)). Rule 37(c)(1) is applicable "when a party fails to comply with Rule 26(a) and then seeks to use the information 'on a motion, at a hearing, or at a trial.'" *Petrone v. Werner Enters.*, 42 F.4th 962, 968 (8th Cir. 2022) (*Petrone II*) (internal citations omitted).

Under Rule 37(c)(1), a party who fails to timely provide an expert report "***is not allowed to use that information* or witness to supply evidence on a motion, at a hearing, or *at a trial*, *unless the failure was substantially justified or is harmless*.**" Fed. R. Civ. P. 37(c)(1) (emphasis added). Although Rule 37 states a court may, in addition to or in lieu of exclusion, issue various other sanctions, the Eighth Circuit has made clear **exclusion is the default sanction**. *Vanderberg*, 906 F.3d at 705; Fed. R. Civ. P. 37(c) advisory committee's note to 1993 amendment (rule "provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need

for a motion"). Moreover, the Court does not need to find bad faith or willfulness before excluding evidence. *Vanderberg*, 906 F.3d at 705 n.4.

"**[T]he burden is on the potentially sanctioned party to prove justification or harmlessness in order to avoid the self-executing sanction of exclusion.**" *Bailey v. City of Bellevue*, No. 4:18CV3132, 2021 U.S. Dist. LEXIS 104645, at *6 (D. Neb. June 3, 2021) (emphasis added). Plaintiff cannot meet that burden because Plaintiff provided *no* justification for its failure to provide calculations for prejudgment interest or back pay after 2019.

Nor is the failure to disclose the calculations harmless. Plaintiff's expert witness testified to never-before-disclosed damage calculations *for the first time* on October 4, 2023, regarding alleged back pay damages for the period of January 1, 2020, to May 14, 2020. (October Transcript 28:5-9). Unlike his earlier calculations, which were based on average earning figures through 2019 provided in Werner's discovery responses, Plaintiff's expert "*extrapolated* what [the] pay [to a Werner driver] *might* be if it were extended" in order to calculate alleged back pay from January 1, 2020, to May 14, 2020. (October Transcript 28:12-17, 35:20-24) (emphasis added). Unlike his earlier calculations, which were based on Robinson's *actual* earnings, Plaintiff's expert *estimated* what Robinson's earnings at Western Express would be through May 14, 2020, just as he estimated what Robinson "might" have earned from January 1, 2020, through May 14, 2020. (October Transcript 28:18-23). None of those estimated figures were provided to Werner *at any time*, either before or after the hearing on October 4, 2023. (October Transcript 29:3-5). Plaintiff's expert testified that, based on his undisclosed *estimates* of earnings, Robinson's back pay damages from January 1, 2020, through May 14, 2020, were "roughly $13,200." (October Transcript 28:24-29:18).

Plaintiff's expert did not provide any explanation for the methodology he used to estimate the amount Robinson "might" have earned had he been employed at Werner in 2020 or the methodology he used to estimate the amount Robinson earned at Western Express in 2020. (*See generally* October Transcript). He did not interview Robinson to confirm whether the estimates were correct or obtain actual earnings records from 2020. (October Transcript 32:18-19). Plaintiff's expert did not obtain updated information from

Werner regarding 2020 wages for drivers and did not consider the impact COVID had on truck driver wages in 2020. (October Transcript 35:16-19, 35:25-36:4).

Similarly, although Plaintiff's only timely disclosed expert report included $3,480.26 in claimed prejudgment interest, Plaintiff's expert testified at the hearing that prejudgment interest actually totaled $13,800. (*Compare* Exhibit 86 at Table 5 *with* October Transcript 27:19-25). He also identified previously-undisclosed prejudgment interest calculations on the undisclosed 2020 back pay damages. (*Compare* Exhibit 86 at Table 5 *with* October Transcript 30:2-6). Plaintiff never disclosed these interest calculations before October 4, 2023. (*Compare* Exhibit 86 at Table 5 *with* October Transcript 26:21-27:6, 27:19-25). Although Plaintiff's expert testified he used "an interest rate from the IRS that changes every quarter," he did not identify what those interest rate(s) were. (October Transcript 26:6-20). Because these rates were never disclosed, Werner was denied the opportunity to analyze whether the interest rate(s) were appropriate or whether the calculations from 2020 – 2023 are accurate. Plaintiff's failure to timely disclose back pay and prejudgment interest calculations for the time period after 2019 was neither justified nor harmless. Accordingly, all such evidence should be excluded and no backpay or prejudgment interest should be awarded for the time period from January, 2020 – May, 2020.

## V. PLAINTIFF'S REQUEST FOR OTHER FORMS OF INJUNCTIVE RELIEF SHOULD BE DENIED.

Plaintiff's request for broad-ranging injunctive relief for an indefinite time period is not warranted here and should be denied. Significantly, Plaintiff's Brief does not address many forms of injunctive relief requested in its Proposed Order on Injunctive Relief (hereinafter "Proposed Order"). Moreover, in many instances, Plaintiff materially mischaracterizes the relief sought in its Brief and uses starkly different terms to describe the requested injunctive relief in its Proposed Order.

Where the Proposed Order contains injunctive relief not specified in Plaintiff's Brief and for which Plaintiff has not provided factual or legal authority, such relief should be denied because Plaintiff has not supported its requests for such relief with authority or explanation. NECivR 7.1(a)(1)(A). (*See also* October Transcript at 101:21-24 ("If it would be in the form of injunctive relief or any other equitable relief, I would want what you're

specifically requesting, the reasons behind it.")). Nor can Plaintiff belatedly supply the Court with authority for those requests in its Reply Brief. *See Infogroup, Inc. v. Databaseusa*, No. 8:14-CV-49, 2017 U.S. Dist. LEXIS 231930, at *6 n.1 (D. Neb. Feb. 21, 2017) (a court does not consider arguments raised for the first time in a reply brief). For this reason alone, the Court should deny the relief requested in Plaintiff's Proposed Order at ¶¶A(4), A(5), B(8), B(9), B(10), B(11), C(14), C(15), C(16), E(20), F(22), G(25), G(26), G(27), & G(28). Moreover, for the reasons set forth below, Plaintiff's request for far-reaching injunctive relief is not supported by the evidence here and should be denied.

### a. Legal Standard.

Injunctive relief is a discretionary remedy and is not mandatory. 42 U.S.C. § 2000e-5(g)(1); 42 U.S.C. § 12117(a); *see Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 676 (8th Cir. 2006) (affirming denial of permanent injunction); *Johnson v. Brock*, 810 F.2d 219, 225 (D.C.Cir. 1987) (noting injunctive relief is not mandatory, "nor have we held that the burden is on the defendant to disprove the need for such an injunction by clear and convincing evidence."); *Briscoe v. Fred's Dollar Store*, 24 F.3d 1026, 1028-29 (8th Cir. 1994) (injunctive relief is reviewed for abuse of discretion).

Once a party has demonstrated success on the merits of a discrimination claim, the court must balance three factors to determine if injunctive relief is appropriate: (1) the threat of irreparable harm to the moving party, (2) the harm to be suffered by the nonmoving party if the court grants the injunction, and (3) the public interest at stake. *Wedow v. City of Kan. City*, 442 F.3d 661, 676 (8th Cir. 2006).

A court's discretion to award injunctive relief "is not unlimited," and "[p]rovisions of an injunction may be set aside if they are broader than necessary to remedy the underlying wrong." *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998). Specifically, injunctive relief, if any, must be limited to the "conduct which has been found to have been pursued or is related to the proven unlawful conduct." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994). Injunctive relief which "impermissibly subject[s] the defendants to contempt proceedings for conduct 'unlike and unrelated to the violation with which [the defendants were] originally charged'" should be vacated. *See EEOC v. AutoZone, Inc.*, 707 F.3d 824, 842-43 (7th Cir. 2013) (internal citations omitted).

15

Similarly, "[a]n injunction that does no more than order a defeated litigant to obey the law" is inappropriately overbroad and vague and "departs from the traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation." *EEOC v. Wal-Mart Stores E. LP*, No. 17-C-70, 2022 U.S. Dist. LEXIS 30382, at *6-8 (E.D. Wis. Feb. 22, 2022) (internal citation omitted); *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 263 (8th Cir. 1985) (reversing order enjoining defendant from "engaging in employment discrimination on the basis of race" because the injunction "applies to all forms of race discrimination against every employee or applicant for every job" and was therefore "far too broad" because it went "far beyond the employment practices challenged" in the case); *EEOC v. Mid-American Specialties, Inc.*, 774 F. Supp. 2d 892, 895-96 (W.D. Tenn. 2011) (citing *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984)) ("obey the law" injunctions are overbroad and cannot be sustained). Applying these standards here, Werner respectfully submits injunctive relief is not warranted.

**b. Plaintiff's requests for an injunction applicable to non-driver applicants and prohibiting retaliation are unrelated to this case and should be denied.**

As an initial matter, Plaintiff seeks wide-ranging injunctive relief for *all* Werner employees and applicants, not limited to drivers, and prohibitions regarding issues unrelated to this case, such as retaliation. (*See* Filing 349-2, Plaintiff's Proposed Order on Injunctive Relief (hereinafter "Proposed Order") at ¶A(3), (4), (5)) (requesting Werner be enjoined from taking adverse action against "an individual" in retaliation for engaging in protected activity under the ADA and from coercing, intimidating, threatening, or interfering with an individual's exercise of rights under the ADA). Plaintiff's requests for wide-ranging injunctive relief that goes well beyond the allegations in this case is improper. See *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) (striking forms of injunctive relief that went "beyond the bounds of the discrimination shown in this case"); *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 263 (8th Cir. 1985) (provisions of an injunction should not be broader than necessary to remedy the underlying wrong). The EEOC did not investigate or conciliate any retaliation claims or claims on behalf of non-

drivers. This case involves an application by a single driver holding an FMCSA Hearing Exemption, and Werner's decision not to hire Robinson because it did not believe Robinson could safely complete Werner's placement driver program. Any request for injunctive relief extending to retaliation and non-driver applicants is overbroad and should be denied. *See*, *e.g.*, *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 842-43 (7th Cir. 2013) (internal citation omitted) (an injunction prohibiting future retaliation should be vacated because it is "too broad" and would "impermissibly subject[s] the [defendant] to contempt proceedings for conduct 'unlike and unrelated to the violation with which [the defendant was] originally charged.'").

> **c.  Plaintiff's request for extensive injunctive relief as to driver applicants should also be denied.**

> *i.  Injunctive relief is not warranted under these facts.*

Werner respectfully submits that, under the circumstances presented here, relief for driver applicants is also not warranted because Plaintiff has not shown a threat of future irreparable harm. *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 676 (8th Cir. 2006). This case involved a single driver applicant who was not hired by Werner. It was not a class action or a pattern-and-practice case. To the contrary, as Magistrate Judge Bazis stated:

> These cases arise from allegations that Werner violated the ADA by not hiring Deuschle and Robinson because they are deaf. … ***This is not a class action lawsuit or a pattern-and-practice suit alleging a pattern of discriminatory decision-making.*** Werner admits it did not hire Deuschle and Robinson because Werner could not safely accommodate their disability in a way that would enable Deuschle and Robinson to complete Werner's training program.

(Filing 207, Order, p. 8) (emphasis added). Moreover, and further contradicting Plaintiff's request for extensive injunctive relief, the *Deuschle* jury found, in a separate case involving almost identical facts, that Werner did *not* violate the ADA by refusing to hire Andrew Deuschle. (Case 8:18-cv-329, Filing 342, *Deuschle* Verdict Form).

In its Brief, Plaintiff requests broad injunctive relief on behalf of "qualified deaf truck drivers," but there is no evidence of a threat of future harm which would support the broad-ranging relief suggested by Plaintiff. The jury in the *Deuschle* case determined Werner

did not discriminate against Deuschle by failing to hire him and Plaintiff has not made any showing of other deaf drivers who have or intend to apply to Werner, whether any of those applicants were otherwise qualified, or whether any such applicant was actually denied employment because of his or her inability to complete the placement driver program. (*See generally* Plaintiff's Brief; *see also* Case 8:18-cv-329, Filing 342, *Deuschle* Verdict Form). Accordingly, this case is a far cry from the cases cited by Plaintiff in which courts entered injunctions after finding consistent and broad-ranging discriminatory practices. *See Briscoe v. Fred's Dollar Store*, 24 F.3d 1026, 1028-29 (8th Cir. 1994) (affirming injunctive relief where employer was found to have engaged in a "consistent practice" of discrimination against Black employees); *Taylor v. Jones*, 653 F.2d 1193, 1203 (8th Cir. 1981) (recognizing the district court granted injunctive relief after finding that "a 'broad-ranging pattern and practice of racial discrimination' existed in the Arkansas National Guard that was long-standing and 'pervasive.'"). Under these circumstances, broad-ranging injunctive relief is not warranted.

> ii.  *The requested injunctive relief is overbroad and unrelated to the discrimination alleged in this case.*

Moreover, contrary to Plaintiff's brief, Plaintiff's requested relief is *not* targeted to "qualified" driver applicants. In fact, the word "qualified" does not appear in its Proposed Order at all. (*See generally* Proposed Order). Rather, Plaintiff seeks broad relief as to *any* deaf and hard of hearing driver applicants–regardless of whether those individuals are qualified. (*See* Proposed Order at ¶A(1) (requesting injunction from denying employment opportunities to *any* driver applicant, regardless of whether qualified, based on "deafness or inability to hear if the applicant possesses [an FMCSA] Hearing Exemption"); ¶A(2) (requesting injunction to provide accommodations to *any* deaf and hard of hearing driver applicants and employees, regardless of whether qualified and unrelated to the placement driver program); ¶A(3) (requesting injunction not to maintain a policy that "denies employment opportunities, including on-the-job training, to any individual on the basis of his or her hearing-related disability or the fact that he or she has an FMCSA Hearing Exemption," without regard to whether the individual is qualified).

Plaintiff's far-reaching requests for injunctive relief for *any* deaf applicant, regardless of his or her qualifications, are inappropriate because this case involved an

applicant who indisputably met Werner's minimum qualifications other than the ability to safely complete the over-the-road portion of the placement driver program. (*See* Filing 286, Order on Final Pretrial Conference, ¶B(10)). Participation in the observed, over-the-road portion of the Company's training program was the *only* item Werner alleges Robinson could not complete. (*See id.*). As such, broad injunctive relief regarding unqualified applicants or accommodations unrelated to the over-the-road portion of the training program are inappropriate. *See EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) (striking forms of injunctive relief that went "beyond the bounds of the discrimination shown in this case"); *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 263 (8th Cir. 1985) (provisions of an injunction should not be broader than necessary to remedy the underlying wrong).

Even with respect to those limited issues, injunctive relief is not warranted, and the case law cited by Plaintiff does not support the relief requested. *Gibson v. Arkansas Dep't of Correction*, 265 F.3d 718, 721 (8th Cir. 2001) addressed whether a private individual could sue a state official for injunctive relief under the ADA and, therefore, does not bear on the EEOC's case against a private company. *Baker v. Union Pac. R.R. Co.*, No. 8:20CV315, 2022 U.S. Dist. LEXIS 163467, at *11 (D. Neb. Sep. 9, 2022) is neither helpful nor applicable here because the *Baker* court did not grant injunctive relief and merely denied a motion to dismiss. Similarly, *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 467 (6th Cir. 1999) is not helpful because the court did not award injunctive relief and merely reinstated an action to permit the EEOC to seek relief.

Contrary to Plaintiff's arguments, injunctive relief is generally reserved for those cases in which an employer is found to have engaged in a "consistent practice" of discrimination affecting multiple individuals. *Briscoe v. Fred's Dollar Store*, 24 F.3d 1026, 1028-29 (8th Cir. 1994) (affirming injunctive relief where employer was found to have engaged in a "consistent practice" of discrimination against Black employees); *EEOC v. Convergys Customer Mgmt. Grp., Inc.*, No. 4:04-CV-846 CAS, 2006 U.S. Dist. LEXIS 46182, at *10-13 (E.D. Mo. July 7, 2006) (granting request for injunctive relief of providing the charging party with a neutral reference letter but otherwise denying request for broad injunctive relief because the evidence did not establish a pattern or practice of disability discrimination, the employer accommodated individuals under the ADA in the past, and

the plaintiff had not sought reinstatement). Where a plaintiff does not seek reinstatement or show lingering effects of discrimination, injunctive relief is often denied. *See, e.g., Dehne v. Med. Shoppe Int'l, Inc.*, 261 F. Supp. 2d 1142, 1145 (E.D. Mo. 2003). And where injunctive relief *is* granted, courts narrowly tailor such relief. *See, e.g., EEOC v. Old Dominion Freight Line, Inc.*, No. 2:11-CV-02153, 2015 U.S. Dist. LEXIS 81977, at *24 (W.D. Ark. June 24, 2015) & Filing No. 291, pp. 18-21 (limiting injunctive relief to prohibition on enforcement of policy, but denying request for further injunctive relief such as training, recordkeeping, and reporting); *Gilbert v. Little Rock*, 799 F.2d 1210, 1215 (8th Cir. 1986) (limiting injunctive relief to prohibiting use of oral exam until it was validated in compliance with guidelines). Consistent with these authorities, Plaintiff's request for broad injunctive relief should be denied.

### d.  Plaintiff's requested relief is inconsistent with Werner's obligations under the FMCSA regulations.

Plaintiff's request for injunctive relief also conflicts with Werner's obligations under the FMCSA regulations. Werner is required by federal DOT regulations to ensure drivers who do not hold an FMCSA Hearing Exemption can pass the "forced whisper" test. 49 C.F.R. § 391.41(b)(11); 49 C.F.R. § 391.11. Contrary to that legal requirement, Plaintiff requests injunctive relief prohibiting any policy or practice that "denies employment opportunities, including on-the-job training, to any individual on the basis of his or her hearing-related disability *or* the fact that he or she has an FMCSA Hearing Exemption." (Proposed Order, p. 1, ¶A(3)) (emphasis added). But if a driver applicant has a hearing-related disability, cannot pass the "forced whisper" test, and does *not* have an FMCSA Hearing Exemption, Werner is prohibited from employing that individual as a driver and must deny the application. 49 C.F.R. § 391.11; 49 C.F.R. § 391.41. Plaintiff's requested injunction is so broad as to require Werner to hire a driver applicant who is barred by the FMCSA regulations from driving for an interstate motor carrier. 49 C.F.R. § 391.11; 49 C.F.R. § 391.41; *see also* 29 C.F.R. § 1630.15(e). Because Plaintiff's requested relief is contrary to law, this request should be denied.

### e.  Plaintiff's request for a "training consultant" should also be denied.

Plaintiff's request for an injunction requiring Werner to engage a "training consultant" should also be denied and, notably, Plaintiff does not cite any case in which

a court has required an employer to retain a "training consultant." (Plaintiff's Brief, pp. 8-9). Contrary to Plaintiff's request, at least one court *denied* requests by the EEOC for an injunction requiring the employer to retain a consultant to evaluate and provide training under similar circumstances. *See EEOC v. Autozone, Inc.*, No. CV 06-926-PHX-SMM, 2009 U.S. Dist. LEXIS 130096, at *12 (D. Ariz. Nov. 9, 2009). In *Autozone*, the court denied the EEOC's request that the defendant be required to "retain and pay for a consultant" to evaluate policies and programs, make a written report, and provide training for a three-year period, finding such relief was not warranted by one proven instance of unlawful discrimination. 2009 U.S. Dist. LEXIS 130096, at *12.

Consistent with that authority, Plaintiff's request for a "training consultant" is not warranted by the jury's finding as to a single applicant, particularly considering the *Deuschle* jury reached the exact opposite conclusion when confronted with similar evidence in the companion *Deuschle* case. Moreover, although Plaintiff offered testimony from other trucking companies that train deaf drivers, Plaintiff did not offer evidence that any other company employed a "training consultant" for that purpose, further undermining Plaintiff's argument that a "training consultant" is necessary here.

In addition, the relief requested by Plaintiff in its Proposed Order on this point goes well beyond the relief described in Plaintiff's Brief. (Plaintiff's Brief, pp. 8-9). Plaintiff's Proposed Order requests–without explanation or justification–that a training consultant be retained for **five years** and "be responsible for ensuring Werner provides accommodations to driver applicants and employees who possess FMCSA Hearing Exemptions," without limiting those accommodations to "qualified deaf truck drivers" or to the placement driver program. Those requests are unrelated to the alleged unlawful conduct here and should be denied. See *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998); *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994).

Plaintiff's Proposed Order also requests Werner be required to provide the training consultant with "sufficient staff and funding," without further clarification or explanation as to why a training consultant would require "staff." (Proposed Order, p. 4, ¶C(14)). Plaintiff also requests Werner be required to allow a "Special Master" to select a training consultant if Werner and the EEOC cannot agree on the individual to be retained but does not provide any support for that unprecedented request. (Proposed Order, p. 4, ¶C(15)).

21

The Proposed Order also suggests *Werner*, not the Training Consultant, should be responsible for "immediately" notifying the EEOC and Special Master if the Training Consultant "resigns or otherwise ceases to perform their role," but does not explain why Werner should bear this responsibility. (Proposed Order, p. 4, ¶C(16)). Because these proposed requirements are patently unreasonable and are not warranted under the circumstances, Plaintiff's request for an injunction requiring Werner to retain a "training consultant" should be denied.

### f. Plaintiff's requests for additional training of recruiting employees and postings for job seekers are overbroad and should be denied.

#### i. *Injunctive relief requiring training is not necessary here*.

Werner does not contest that training of employees on the requirements of the ADA is important but respectfully submits that an injunction requiring Werner to provide training to employees involved in hiring and recruiting truck drivers on the company's obligations under the ADA is unnecessary here. (Plaintiff's Brief, p. 2; *see also id.* at p. 9). *See EEOC v. Corinth, Inc.*, 824 F. Supp. 1302, 1313 (N.D. Ind. 1993) (declining to order injunctive relief requiring training). Werner provides annual training for recruiters and other employees regarding antidiscrimination and the company's obligation to accommodate individuals with disabilities. (Filing 345, Trial Transcript, Vol. III, 648:13-649:14).

While Plaintiff argues certain statements made by Werner recruiting employees evidence a need for additional training, the handful of stray remarks on which Plaintiff relies did not involve Robinson's application and were not made by the individuals who decided to reject Robinson's application. (Filing 346, Trial Transcript, Vol. IV, 818:3-12). There is no evidence of any discriminatory statements made by Jaime Hamm, the decisionmaker, or regarding Robinson's application. *See Wal-Mart Stores E. LP*, 2022 U.S. Dist. LEXIS 30382, at *8-9 (even continued employment of supervisors involved is not, by itself, a sufficient reason to grant an injunction). Where, as here, an employer's policies and procedures inform its employees of their rights under the ADA, and there is no evidence the employer is a corporation that "flouts its obligations or is unconcerned about complying with laws prohibiting discrimination," an injunction requiring training

should be denied. *See Wal-Mart Stores*, 2022 U.S. Dist. LEXIS 30382, at *8-9 (internal citations omitted).

Moreover, although Plaintiff's Brief does not address the frequency or duration of mandatory training (Plaintiff's Brief, p. 2, 6), Plaintiff's Proposed Order unreasonably requests Werner be required to provide ongoing training ***every six months for an indefinite time period.*** (Proposed Order, p. 5, ¶D(19)). Such repetitive training obligations are neither reasonable nor warranted here and are not supported by the case law cited by Plaintiff. *See EEOC v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 1313, 1323 & 1331 (D.N.M. 1998) (awarding injunctive relief of a single training for supervisory and managerial employees at a single store where the evidence demonstrated "'there was no training' on the ADA" during the time period underlying the ADA violation); *EEOC v. Corinth, Inc.*, 824 F. Supp. 1302, 1313 (N.D. Ind. 1993) (declining to require company owners "attend training seminars or classes to better educate themselves on discrimination in the work place" and reasoning that "[w]hile it is the legal obligation of the [company] owners to acquaint themselves with the law, and follow its mandates, this Court will not require that they are forced to attend class. The obligation to know and follow the law is solely their own, and they will be held accountable for failing to act as the law requires."). Consistent with these authorities, Plaintiff's unsupported and overly broad request for training should be denied.

ii. *The notice requested by Plaintiff is neither necessary nor reasonable*.

Plaintiff also argues Werner should be ordered to notify potential applicants that Werner will hire and provide reasonable accommodations to qualified deaf truck drivers because, according to Plaintiff, deaf driver applicants are "likely to have heard that Werner is unwilling to train deaf drivers." (Plaintiff's Brief, p. 9). Plaintiff provides no factual support for this speculative assumption and Plaintiff's speculation about what potential applicants might have heard does not establish a threat of future harm warranting injunctive relief. *See EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 962 (E.D. Tenn. 2017) (denying request for injunction requiring notice and a letter to employees from the CEO).

Moreover, although Plaintiff's Brief requests notice be provided to "qualified deaf truck drivers," the Proposed Order actually requests that Werner be required to include a

statement that Werner "will hire, employ, and provide reasonable accommodation to deaf and hard of hearing drivers who possess an FMCSA Hearing Exemption," **without regard to whether the driver is qualified**, in "all job postings and advertisements, marketing materials, and on the landing, careers, and contact pages of its website," **indefinitely** with no temporal limitation. (Proposed Order, p. 4, ¶D(18)). Plaintiff provides no explanation for why it removed the reference to "qualified" applicants from its Proposed Order and does not explain why each and every job posting, advertisement, and marketing material published by Werner should include this statement, particularly those not directed at driver applicants. The scope of this request–which include postings having nothing to do with driver recruitment–and its indefinite time frame are patently unreasonable and plainly inappropriate in this case, which involved a single driver who was not hired. Plaintiff's request for this relief is also contrary to the case law cited by Plaintiff. *See EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 962 (E.D. Tenn. 2017) (denying request for injunction requiring notice and a letter to employees from the CEO); *see also EEOC v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 1313, 1323 & 1331 (D.N.M. 1998) (awarding injunctive relief of the posting of a single notice at a store); *United States EEOC v. Custom Cos.*, Nos. 02 C 3768, 03 C 2293, 2007 U.S. Dist. LEXIS 16691, at *60 (N.D. Ill. Mar. 8, 2007) (requiring the posting of "a notice" for employees where trial established claims of sexual harassment and retaliation by three employees); *EEOC v. Corinth, Inc.*, 824 F. Supp. 1302, 1313 (N.D. Ind. 1993) (requiring "[a]ppropriate notice … be posted notifying all employees of their rights under the Civil Rights Act of 1964…").

> ### g. Plaintiff's requests for a Special Master should be denied because these requests are unnecessary and overbroad.

> #### i. *Appointment of a third-party Special Master for monitoring purposes is contrary to overwhelming case law and is not warranted here.*

Plaintiff requests the Court "appoint a Special Master to ensure Werner's compliance with the Court's order" and argues a Special Master is necessary to "help facilitate the company's compliance while minimizing the burden on the Court to monitor such compliance." (Plaintiff's Brief, p. 2, 6, 10). Plaintiff does not articulate any "burden" the Court would have and does not cite any case in which a court granted a request to appoint a special master under similar circumstances.

To the contrary, the Eighth Circuit and other courts have routinely *denied* similar requests by the EEOC seeking appointment of a monitor or Special Master as unnecessary based on a finding of discrimination for a single aggrieved individual. *See EEOC v. HBE Corp.*, 135 F.3d 543, 558 (8th Cir. 1998) (reversing order requiring appointment of a third party monitor as "broader than necessary" and because "[a]ppointment of a monitor would only address speculative future harm"); *EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 964 (E.D. Tenn. 2017) (internal citation omitted) (concluding monitoring requested by EEOC was overbroad and unnecessary based on one instance of unlawful discrimination); *Kulling v. Grinders For Industry, Inc.*, 185 F. Supp. 2d 800, 822-823 (E.D. Mich. 2002) (denying injunctive relief proposed by the plaintiff, which included a permanent injunction, appointment of a 'special monitor' and annual training, where the court found that the aggregate monetary award, in addition to attorney fees and costs, was sufficient to discourage the defendants from further violation of federal discrimination laws); *EEOC v. New Prime, Inc.*, No. 6:11-CV-03367 MDH, 2016 U.S. Dist. LEXIS 74962, at *6 (W.D. Mo. May 26, 2016) (denying EEOC's request to appoint an outside monitor as overly broad and unnecessarily intrusive and because the monitor's oversight and investigative authority, as proposed by the EEOC, goes far beyond the discriminatory policy at issue in the case).

Significantly, although not mentioned in Plaintiff's Brief, Plaintiff's Proposed Order further expands on this unreasonable request by seeking appointment for a 5-year period and that Werner be ordered to compensate the Special Master, reimburse the Special Master's expenses, and "cooperate with" a Special Master, without explanation or authority. (*Compare* Plaintiff's Brief, pp. 2, 6, and 9 *with* Proposed Order, p. 2, ¶¶B(7), (8) & (9)). Curiously, Plaintiff's Proposed Order also states Plaintiff's request for a "Special Master" does *not* refer to the Special Master identified in Rule 53, but Plaintiff fails to cite any other case or rule supporting its request for a Special Master. (*Compare* Plaintiff's Brief, pp. 2, 6, and 9 *with* Proposed Order, p. 2, ¶B(7)).

Similarly, in its Proposed Order, Plaintiff suggests Werner should be required to identify an employee to serve as "Primary Contact" between Werner and a Special Master and the Primary Contact should be an individual "at the Vice President or Director level or higher" but *not* "Vice President of Safety Jaime Hamm *or any other employee in*

*Werner's Safety Department*." (Proposed Order, p. 3, ¶B(10)). Plaintiff provides no explanation or justification for its apparent request that Werner's entire Safety Department be precluded from communicating with an individual to whom Plaintiff asks the Court to grant de facto hiring authority and such a request is patently unreasonable considering Werner is an interstate motor carrier charged with ensuring the safety of its drivers and the motoring public. The Proposed Order also requests, without explanation, that *Werner*, not the Special Master, should be responsible for "immediately" notifying the EEOC if the Special Master "resigns or otherwise ceases to perform their role." (*Compare generally* Plaintiff's Brief *with* Proposed Order, p. 3, ¶B(11)).

Plaintiff's request for appointment of a Special Master for purposes of monitoring Werner's actions is contrary to the overwhelming weight of authority and is not warranted here. The additional requirements and restrictions suggested by Plaintiff in the Proposed Order should likewise be denied because they are not supported by explanation or authority and are unreasonable and unnecessary under the facts here, where the finding of discrimination was limited to a single applicant.

### ii. Appointment of a Special Master for dispute resolution purposes would infringe on Werner's constitutional right to trial by jury.

In its Proposed Order, Plaintiff also asks the Court to appoint a Special Master to oversee a detailed dispute resolution process which is not mentioned in Plaintiff's Brief and for which Plaintiff provides no factual or legal support or explanation whatsoever. Specifically, Plaintiff's Proposed Order asks the Court to:

- Authorize the Special Master to "resolve all disputes arising under this Order, subject to limitations and standards set forth herein." (Proposed Order, p. 6, ¶G(25)).
- Establish a procedure for the EEOC to provide written notice of disputes, for Werner to "respond in writing," and for the Special Master to "determine whether the requirements of [the] Order have been fulfilled." (Proposed Order, p. 6, ¶G(26)).
- Require the Special Master to provide the parties "with a written finding resolving the dispute." (Proposed Order, p. 6, ¶G(27)).

- Permit a party to "appeal" a decision of the Special Master to the Court only on grounds that the Special Master made clearly erroneous findings of fact or wrongly interpreted or applied the terms of the Order. (Proposed Order, p. 6, ¶G(28)).

Plaintiff does not provide any authority to support its request that a third-party Special Master be appointed to resolve disputes. (*See generally* Plaintiff's Brief). Nor is such relief warranted here. Due to the breadth of Plaintiff's request for injunctive relief, it seems clear the request for a Special Master to resolve disputes would necessarily mean *any* ADA accommodation claim would be resolved by a Special Master. This would improperly "deny [Werner] the protections of the normal administrative and adjudicative processes" to which it is entitled to defend such claims. *See EEOC v. AutoZone, Inc.*, 707 F.3d 824, 844 (7th Cir. 2013).

To the extent Plaintiff's requests for a limited dispute resolution process would place the responsibility for determining who is or is not qualified in the hands of a Special Master, such an order would unconstitutionally deprive Werner of its right to a trial by jury to resolve disputes regarding such a determination. Whether a driver is "qualified" or not is a fact-intensive determination based on an applicant's work history, experience, driving record, and drug and criminal background screenings. To the extent a deaf applicant does not meet that standard, a decision to reject that applicant as unqualified is not discriminatory. An Order allowing a Special Master to resolve disputes about qualifications would improperly deprive Werner of its discretion to hire only candidates who meet its legitimate hiring qualifications and to fully defend itself through trial.

Incredibly, Plaintiff plainly acknowledges its request for injunctive relief is designed to deprive Werner of its right to a jury trial in future cases, asserting injunctive relief is necessary to avoid "individual lawsuits along with the attendant administrative prerequisites" in the event a future violation is alleged. (Plaintiff's Brief, p. 7). But, as plainly illustrated by the disparate jury verdicts in the *Deuschle* case and this case, individual lawsuits are necessary in failure-to-hire cases because no two applicants are the same. Whether an applicant is qualified is a fact-specific and fact-intensive determination dependent upon the applicant's unique qualifications as compared to the other applicants for the same role. Under Plaintiff's request for dispute resolution by a Special Master, the claim previously brought by Andrew Deuschle would be resolved by

27

a Special Master–based on "phone calls, in person meetings," and information required by the Special Master to be produced–rather than by the jury empaneled before this Court, which unanimously determined Deuschle was *not* a victim of discrimination. Plaintiff's request to bypass the normal adjudicative process through the appointment of a Special Master is contrary to law. *See Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956) (appointment of a special master "should be the exception and not the rule in judicial administration," and a court may not appoint a special master where doing so would result in "**infringement upon the right of trial by jury or any prejudice to other substantive right.**") (emphasis added); *see also EEOC v. Wal-Mart Stores E. LP*, No. 17-C-70, 2022 U.S. Dist. LEXIS 30382, at *6-8 (E.D. Wis. Feb. 22, 2022) (citing *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013)) (rejecting an injunction as overbroad because it would be "enforceable via contempt motion," thereby impermissibly "bypassing the normal administrative and adjudicative processes for ADA accommodation claims."). Consistent with this authority, Plaintiff's request to bypass the normal adjudicative processes in favor of a truncated process determined by a Special Master and limited appeal rights should be denied.

### h. Plaintiff's request for frequent and exhaustive reporting obligations should be denied.

In its Brief, Plaintiff vaguely requests Werner be ordered to "report information to the Special Master and the EEOC to determine its compliance," but Plaintiff's Proposed Order actually seeks exhaustively detailed quarterly reports for years. (*Compare* Plaintiff's Brief, p. 2 & 6 *with* Proposed Order, pp. 5-6 ¶E(20)). Specifically, Plaintiff's Proposed Order asks the Court to require Werner to provide written reports on a quarterly basis for at least 5 years containing detailed explanations of:

- All actions taken to comply with the terms of the Order, all accommodations made to deaf or hard of hearing individuals or an explanation as to why no such accommodations were made;

- The name and contact information of "all known or suspected deaf and hard of hearing individuals who applied to work as a driver for Werner," including all date(s) of contact, date(s) of application, the position(s) sought, whether the individual possessed an FMCSA Hearing Exemption, whether Werner hired the individual,

and the reason for rejection if not hired;

- The name and contact information of all applicants and employees who requested accommodation of a hearing-related disability, including the type of accommodation sought, accommodations provided, and reason for denying any accommodation requested; and

- The name and contact information of all FMCSA Hearing Exemption holders who left employment with Werner and an explanation of how and why the individual's employment was terminated. (Proposed Order, pp. 5-6 ¶E(20)).

The detailed quarterly reports requested by Plaintiff go well beyond the allegations in this case, which involve the failure to hire a single driver because Werner did not believe he could safely complete the observed, over-the-road portion of Werner's placement driver program. This case did not involve accommodation requests by non-driver applicants and employees; accommodations unrelated to the observed, over-the-road portion of the placement driver program; reasons for rejection unrelated to the observed, over-the-road portion of the placement driver program; or termination of existing employees. Because this case did not involve any of those issues, a request that Werner be required to report to the EEOC on those subjects is inappropriate and should be denied. *See EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998); *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994) (injunctive relief, if any, must be limited to the "conduct which has been found to have been pursued or is related to the proven unlawful conduct.").

Plaintiff similarly provides no explanation for why Werner should be required to provide detailed information regarding candidates "suspected" of being hard of hearing, and that request is not feasible because Werner does not separately track applicants by whether they are deaf or hard of hearing and does not engage in speculation or "suspicion" about whether an applicant has a disability. There would be no way for Werner to even attempt to comply with such a reporting requirement without separately identifying and processing the applications of individuals "suspected" of being deaf or hard of hearing–a process which the EEOC has alleged in the *Deuschle* case is unlawful. (*See* Case No. 18-cv-329, Filing 101, Amended Complaint at Count III).

Moreover, the requested relief far exceeds the limited reporting in cases where courts have found such injunctive relief appropriate. *See EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 964 (E.D. Tenn. 2017) (requiring the employer to forward a copy of attendance sheets for training sessions to the EEOC and submit a single affidavit to the EEOC establishing the completion of training); *EEOC v. Autozone, Inc.*, No. CV 06-926-PHX-SMM, 2009 U.S. Dist. LEXIS 130096, at *13 (D. Ariz. Nov. 9, 2009) (denying request to impose requirement employer make reports to the EEOC regarding policy changes, employees who bring allegations of sexual harassment, and lists of all personnel who attend certain training because "one instance of [unlawful discrimination] in a company with 2,500 employees in Arizona does not warrant the imposition of monitoring and reporting requirements"). The proposed reporting requirements are unduly burdensome on their face and the "bureaucracy of this request is excessive." *EEOC v. DCP Midstream, L.P.*, 608 F. Supp. 2d 107, 111-12 (D. Me. 2009) (denying a request that an employer be required to report protected activity to the EEOC along with detailed information regarding the complainant, the protected activity, the alleged wrongdoer and the employer's response because such "reporting requirements are unduly burdensome given the excessive detail to be furnished to the EEOC, including unnecessary personal information such as birth dates and social security numbers, which are sensitive information considering current concerns over identity theft and because "the bureaucracy of this request is excessive"). Consistent with the authorities cited herein, Plaintiff's overbroad request for reporting obligations should be denied.

> **i.   Plaintiff's request for document preservation and disclosure unreasonably encompasses documents having nothing to do with Plaintiff's allegations in this case.**

Although mentioned only in passing in its Brief, Plaintiff's Proposed Order also asks the Court to impose burdensome recordkeeping obligations and require Werner to disclose records having nothing to do with this case to a Special Master and the EEOC. Specifically, Plaintiff's Proposed Order asks the Court to require Werner to retain, for 5 years, "all documents (including ESI *related to its compliance with the ADA* and this Order, including records of communications with, applications from, and employment records of known or suspected deaf and hard of hearing individuals seeking employment

with and employed by Werner." (Proposed Order, p. 6, ¶F(21)) (emphasis added). Plaintiff also requests that Werner be required to, upon request, provide the Special Master and the EEOC "with any documents related to its compliance with the ADA and this Order" at any time, without temporal limitation. (Proposed Order, p. 6, ¶F(22)).

These requests are patently overbroad and encompass all documents "related to" compliance with the ADA, many of which have nothing to do with deaf or hard-of-hearing applicants. As such, these requests are far "broader than necessary to remedy the underlying wrong," and appear to be nothing more than a transparent request for leave to conduct unfettered fishing expeditions at whim. *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998). Moreover, for the reasons stated above, requiring Werner to separately retain detailed documents regarding individuals "suspected" of being deaf or hard of hearing is not feasible and is contrary to the EEOC's argument in the *Deuschle* matter that treating such applicants differently in any way is improper. Plaintiff's request for voluminous document retention and disclosure obligations should be denied. *See EEOC v. New Prime, Inc.*, No. 6:11-CV-03367 MDH, 2016 U.S. Dist. LEXIS 74962, at *7 (W.D. Mo. May 26, 2016) (denying the EEOC's request to require the employer to maintain certain documents for inspection and reasoning the employer "will be expected to retain documents only as may otherwise be required by law"). For these reasons, Werner requests that the Court deny Plaintiff's request for injunctive relief.

### VI.    PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CONTAIN SWEEPING GENERALIZATIONS AND SPECULATIVE STATEMENTS NOT SUPPORTED BY EVIDENCE OR LEGAL AUTHORITY.

This case involves a single truck driving applicant who, after his rejection by Werner, was involved in several motor vehicle accidents and ultimately stopped worked as a commercial driver. Notwithstanding the limited nature of this case, Plaintiff asks the Court to make sweeping conclusions and vague generalizations about all deaf drivers which are not supported by the record, including:

- Conclusions regarding accident rates, whether and to what extent driving is "predominantly" a visual task, what percentage of the information which a driver receives while driving is visual, and a lack of "evidence of emergency driving

situations," based on reports not in evidence and testimony from a behavioral scientist about "research and the literature…[he] reviewed." (*Compare* Filing 349-1, Proposed Findings of Fact and Conclusions of Law (hereinafter "Proposed Findings"), pp. 2 & 8, ¶¶6, 61, 62 *with* Filing 344, Trial Transcript Vol. II, p. 249-250, 272).

- Concluding Robinson's training at Roadmaster included "over the road" driving, when the testimony actually states Roadmaster "road training" involves predetermined courses driven by students for not more than an hour at a time. (*Compare* Proposed Findings, p. 3, ¶19-22 *with* Filing 345, Trial Transcript Vol. III, p. 601:1-25).

- Concluding the communications between Robinson and a trainer during "over-the-road training" at Roadmaster were "safe and effective," based on a response stating, "[g]iven the parameters of a CDL school and that 60 to 70 percent of the time is on a closed course, private property, and the on-the-road training is on predetermined routes, it's workable for Roadmaster to train deaf students." (*Compare* Proposed Findings, p. 3, ¶24 *with* Filing 345, Trial Transcript Vol. III, 620:6-11).

- Concluding methods of communications can be used for *all* deaf students based on a single trainer's testimony of what methods he "might" use during training. (*Compare* Proposed Findings, p. 3, ¶25-26 *with* Filing 342, Trial Transcript Vol. I, pp. 165-166; *see id.* at 165:6-8 ("What -- can you tell us what basic signs or give us some examples of some of the basic signs or hand signals that you might use.").

- Conclusions as to the amount of time it takes for a driver to observe *any* hand signal in a cab, without reference to what the hand signal is, as compared to the amount of time it takes to look at mirrors on the truck, based on a single trainer's testimony of how much time he believes it takes to observe hand signals in a cab. (*Compare* Proposed Findings, p. 4, ¶27 *with* Filing 342, Trial Transcript Vol. I, p. 166:22-167:2).

- Concluding *all* deaf students *can* observe hand signals in their peripheral vision based on testimony that it is "*possible* for… a deaf student to see hand signals in their peripheral vision." (*Compare* Proposed Findings, p. 4, ¶28 *with* Filing 342,

Trial Transcript Vol. 1, p. 167:3-5).

- Concluding *all* deaf drivers "could safely communicate" with a trainer while driving based solely on the jury's findings as to Robinson's application. (*Compare* Proposed Findings, p. 6, ¶54 *with* Jury Verdict; *see also* Case 8:18-cv-329, Filing 342, *Deuschle* Verdict Form).

- Conclusions as to methods *all* deaf drivers can use to communicate with trainers while driving, accommodations applicable to any deaf driver, and that such accommodations are "reasonable and effective" for any deaf driver, based on the testimony of one driver trainer and an expert who never trained any commercial driver, deaf or hearing. (*Compare* Proposed Findings, p. 7, ¶¶55-57 *with* Filing 342-343, Trial Transcript Vol. II & III, p. 211, 258-272, 280:10-15).

- Speculation that "other reasonable accommodations may be available," without specifying the nature of the "other reasonable accommodations." (Proposed Findings, p. 7, ¶58).

- Concluding *all* deaf drivers can learn the Smith System of defensive driving "in the classroom setting and then through nonverbal reminders such as flashcards," based on the testimony of a human factors expert who has never trained a commercial driver. (*Compare* Proposed Findings, p. 8, ¶63 *with* Filing 342-343, Trial Transcript Vol. II & III, p. 275-276, 280:10-15).

- Other conclusions unsupported by the record, such as unsupported opinions about whether talking is a distraction for hearing students and whether CDL school is "easier for" deaf students than it is for hearing students. (Proposed Findings, p. 7, ¶¶30, 31).

The conclusions Plaintiff asks the Court to reach are not "facts," as Plaintiff disingenuously suggests. These are sweeping generalizations that are not substantiated by admissible evidence for *any* deaf driver and the evidence certainly does not establish that any of these speculative assumptions are true for *all* deaf drivers, as Plaintiff asks this Court to "find" as a factual matter.

Plaintiff's Proposed Findings of Fact and Conclusions of Law also ask the Court to make unsupported conclusions about other companies and Werner, such as:

- Conclusions about the practices of companies other than Werner, including that

different companies have trained an unspecified number of deaf or hard of hearing drivers, when the testimony offered at trial confirmed certain companies had gone many years without training a deaf driver and that it was rare to have a hearing impaired trainee. (*Compare* Proposed Findings, p. 8-10, ¶¶65-72 *with* Filings 344 & 345, Trial Transcript Vol. II & III, 323:25-324:3, 472:10-13).

- Conclusions about what Werner's Vice President of Safety, Jaime Hamm, does or does not "believe," based on her testimony that Werner has not been able to identify an accommodation that Werner believes would safely allow a deaf inexperienced driver to communicate with his trainer in the cab. (*Compare* Proposed Findings, p. 10-11, ¶81, 83 *with* Filing 346, Trial Transcript Vol. IV, 822:1-5).

Not only are these findings unsupported, they are neither relevant nor necessary for the Court to rule on Plaintiff's request for injunctive relief. For these reasons, the Court should decline to adopt Plaintiff's unsupported and speculative Proposed Findings of Fact and Conclusions of Law and should, instead, adopt the Proposed Findings of Fact and Conclusions of Law set forth by Werner.

## VII.   CONCLUSION

Werner requests the Court adopt Werner's Proposed Findings of Fact and Conclusions of Law, enter an Order limiting back pay to the period through September 2016, decline to award further injunctive relief, and decline to adopt Plaintiff's Proposed Order and Proposed Findings of Fact and Conclusions of Law.

DATED this 4th day of December, 2023.

DRIVERS MANAGEMENT, LLC and
WERNER ENTERPRISES, INC.
Defendants

BY:   */s/ Elizabeth A. Culhane*
Patrick J. Barrett, #17246
Elizabeth A. Culhane, #23632
FRASER STRYKER PC LLO
409 South 17th Street, 500 Energy Plaza
Omaha, NE 68102-2663
(402) 341-6000
pbarrett@fraserstryker.com
eculhane@fraserstryker.com
ATTORNEYS FOR DEFENDANTS

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit in NECIVR 7.1 because it contains 12,865 words and the word-count function of Microsoft Word was applied to include all text.

*/s/ Elizabeth A. Culhane*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was electronically filed, using the CM/ECF system, on December 4, 2023, which sent notification of all parties' counsel of record.

*/s/ Elizabeth A. Culhane*

3101011v6